Judge Uiíderwood and Judge Nicholas
delivered separate Opinions in this case — in the decision of which the Chief Justice, being related; to one of the parties, took no share.
Judge UndeRwood: —
The plaintiff relied on a grant to
John Harvie, dated in 1786; the defendant on a grant to Bartlett Bennett, dated in 1789, and continued possession, by settlement and residence of tenants, for seven years prior to the institution of suit.
The evidence concluded, the plaintiff moved the court for various instructions. Among them were the following, which the court refused to give:—
1. That an adverse possession of the land in controversy, by a residence thereon of the tenant or tenants of , , . . the defendant, for a period less than twenty years, does not bar the right of the plaintiff to recover in this action.
2. That the possession in part, by the junior patentee, must be in the name of the whole, or the entry of those *482 claiming under the elder patentee is not tolled, except as to so much land as was in the actual occupancy of the junior patentee.
Instructions con sidered irrelevant, and the question not decided here. See J>. 501.
~*-8: '-¡That so much of the act entitled an act to revive and amend the champerty and maintenance law and more effectually to save the bona jide occupants of lands within this commonwealth, passed and approved January 7th, 1824, which subjects to forfeiture the lands of both residents and nonresidents for failing- to improve them, according to the provisions of the eighth section of said act, is repugnant and contrary to the constitution of the United States, as being in violation of the compact between the states of Virginia and Kentucky.
4. That the certificate of the auditor of the forfeiture of three thousand and thirty five acres of land in the name of Philip Duvall, is not sufficient in law, without further testimony7, to shew that a part of the land in controversy is thereby vested in the commonwealth.
5. That the certificate of the auditor, offered in evidence by the defendant, shewing the forfeiture of three thousand and thirty five acres of land to the commonwealth, in the name of Philip, is not sufficient to prove that any part of William Duvall’s interest in the twelve thousand one hundred and forty eight acres, is thereby vested in the Commonwealth, unless it is first shewn that the title of said William had been previously conveyed to said Philip Duvall.
6. That if the jury believe from the evidence, that James M. Gaines, one of the lessors of the plaintiff, had under fence and cultivation within the limits of Harvie’s patent for twelve thousand one hundred and forty eight acres, subsequent to the conveyance of Barrett and wife to said Gaines, and prior to the 1st day of August, 1825, more than five acres for every thousand contained in said patent, then the claim, right, title and interest of said Gaines was not forfeited under the act of champerty and maintenance, passed and approved January 7th, 1824.
Upon the application of the defendant, the court gave the following instructions :—
1. That if the jury believe from the evidence, that *483 the said tract of land patented to J. Harvie, and claimed by the lessors of the plaintiff, was not, on or before the 1st day of August, 1825, demonstrated, made public, and accompanied by the actual cultivation and improvement thereof, by clearing, fencing and tending at least five acres of said tract, and by belting or chopping the trees, except such as were required for rails to enclose the same, in at least ten acres for every thousand acres in said tract, knit to and connected with the claim, interest or title to said tract of land set up by the lessors of the plaintiff, then the said claim, right, title and interest of said lessors of the plaintiff is forfeited, and they must find for the defendant.
Instructions con sidered irrelevant, and the question not decided here. Se* p, 501.
A- tenant in common cannot recover upon a joint demise.— See p. 501.
Page 481.
Page 481-
2. That if the jury shall believe from the evidence, that the undivided moiety of said tract of land patented to J. Harvie, which was conveyed to said Duvall, by said deed to Barrett and Duvall, has been forfeited, or stricken off to the state for the nonpayment of the taxes, and has not been redeemed, then they must find for the defendant as to that undivided moiety.
3. That the jury must find for the defendant, as in case of a nonsuit, on all the demises in said plaintiff’s declaration, except the demise from James M. Gaines, and on that demise, if they can find for said plaintiff as to any part, it can only be for one undivided moiety.
Other instructions were given on the application of the defendant. But it is unnecessary to copy them, as their correctness does not admit of doubt. The jury found for the defendant, and the plaintiff has appealed.
The points now agitated grow out of the instructions asked by the plaintiff, and refused ; and those given on-the application of the defendant.
Instruction No. 1, asked by the plaintiff, was correctly refused. The case of White vs. Bates (not reported) settles the point.
Instruction No. 2, asked by the plaintiff, contains the law. It should have been given, unless it phraseoloy rendered it abstract. A small change, making it apply to the facts of the case and names of the parties, will obviate everv objection to it.
Instructions No. 3 and 6, asked by the plaintiff, and *484 No. 1, asked for by the defendant, may be considered together. From the mahner they were disposed of, it is clear that the court resolved to enforce the forfeiture contemplated by the act, of the 7th January, 1824, for a failure to improve as required by the eighth section. Instruction No. 6, uses the expression, “Jive acres forr every thousand.” The evidence would have justified the insertion of ten instead of five. It may be that an error has been committed in transcribing, but as the instruction reads, it is not authorized by tire statute, and was therefore correctly refused.
The provisions of ‘an act to revive and amend tho champerty and maintenance law’ Src. of Tan. 7,1824, which declare that the lands o'f proprietors and claimants shall be forfeited to the commonwealth, unless certain improvements are made thereon, as required by the act, are unconstitutional void. — See the reasoning and concurrent con-elusion of.Tudge Nicholas, post.
. Instructions 3 and 1 fairly present the question, whether the eighth section of the act of 1824, to “revive and amend the champerty and maintenance law, and more effectually to secure the bona fide occupants of land within this commonwealth,” is compatible with tire constitutions of tho United States and of this state. This section forfeits to the commonwealth, without inquisition, or office found, or judgment, every tract of land of more than one hundred acres, unless the proprietor thereof should, if it be wood land, cause five acres to be cleared, fenced and tended, and ten acres for every thousand to be belted before the 1st of August, 1825. If the greater part of the land be in the barrens, then ten acres for every thousand were required to be enclosed by good fence. The proviso to the last section of the act probably intended to exempt “flooded land on which no settlement can he made” from forfeiture, although not improved as required by the eighth section. That proviso exonerates “ citizen proprietors''1 residing on, or in possession of one of their surveys^ from cultivating or improving any other of their lands on which there is no conflicting claim or title.
The preamble to the eighth section explains the object of the legislature in forfeiting lands for nonimprovement. . The design was to counteract the opinion and •decision of the supreme court of the United States rela-ative to those acts, usually called occupant laws, which provide a remedy for securing to occupants compensation for their improvements, when evicted. Fully to accomplish the object, the ninth section vests the title, *485 which may be forfeited by the operation of the eighth section in the person holding possession. The tenth section provides, in substance, that any person may escape the effects of the forfeiture, by engaging under hand and seal to abide by the provisions of various acts of assembly, the titles of which are given; or in other words, the forfeiture is released if the claimant will agree to pay the occupant for improvements according to the rule prescribed by the legislature. The preamble adverting to the calamities which our citizens were likely to suffer, and to the duty of protection which the government owed them, says: “This commonwealth is called upon, reluctantly to exercise her sovereign power over the lands lying within her territorial jurisdiction, by enacting forfeitures for want of cultivation and improvement; which power she has hitherto forborne to exercise, by substituting other acts of legislation, which seemed to her councils more liberal and less severe L thus appears, that the legislature has, in the most deliberate manner, asserted the power to forfeit lands for a failure to cultivate and improve them, as the legislature may from time to time direct. And under this power, by the act in question, the legislature has undertaken to transfer the title of the claimant to the occupant, unless the claimant agrees to terms.
The situation of our land titles, and the hardships which the occupant would likely suffer from an eviction without compensation for his improvements, were powerful appeals to the sympathy of the legislature. The fourth condition upon which the, district of Kentucky was erected into an independent state, providing that “neglect of cultivation or improvement of any land should not subject nonresidents to forfeiture or other penalty within the term of six years after the admission of said state into the federal union,” was calculated to give rise to the inference, that lands might be forfeited for nonimprovement after the said six years had elapsed. Under these circumstances, it is not surprising that the legislature should have been willing to adopt a “sci'e?'e” remedy, for evils of alarming magnitude to those of our citizens subject to the sinister operation of *486 the decision of the supreme court against our occupant laws. I am not insensible to the laudable motives which rnay have influenced the members of the legislature in the passage of the act of 1824, now'under consideration; but believing, as I do, that the power to forfeit lands for nonimprovement, asserted by that act, is incompatible with the constitutions' of the United States, and of this state, I shall proceed to assign the reasons for my opinion.
I think no inference drawn from the fourth condition of the compact, can sustain the act in question, when applied for the purpose of forfeiting lands unconditionally granted to individuals in fee simple. Lands thus granted become the absolute property of the grantee, in virtue of a contract made with the government, of which the patent is the evidence. I know of no principle which will allow the government, any more than an individual, after fairly selling and conveying land, to take hack the land and resume the title, at its own pleasure, against the assent of the grantee. Neither am I acquainted with any principle which will allow the government to annex new conditions, unknown at the time of the original contract; and for a violation of them seize the land, divest the citizen of his title, and retain the consideration which the citizen paid or rendered, without remunerating him therefor. Those constitutional provisions, which were intended to secure the inviolability of contracts, apply as well to contracts made between the government of a state and its citizens, as to contracts be1 tween individuals. In the nature of things, there is as much reason for providing that a state shall not impair the obligation of its own contracts, as to provide that it should, not impair the obligation of contracts between individuals. Indeed, there is greater necessity for putting a state under restrictions in regard to her own contracts, than in relation to the contracts of individuals ; for as it respects the contracts of individuals, a state may be considered as impartial; but concerning its own contracts, it may be affected by a principle of selfishness. It is enough, however, that the constitution of the U States and of this state makes no distinction between con *487 tracts to which the state is a party, and those to which she is not. If, therefore, the grant or patent to Harvie, should be considered in the light of a contract, by which Virginia translerred her title to him, Virginia, and con-§equently Kentucky, claiming under Virginia, can no more resume the title, without the assent of Harvie, or those claiming under him, than Harvie could take it from Barrett and Duvall, to whom he conveyed, or Irotn those claiming under them, without their assent.
If there were any lands in the district of Kentucky, which had been granted upon condition that the grants should be forfeited, unless the lands, or town lots, were cultivated or improved within a given period, there may have been good reason for inserting the fourth condition of the compact. Conceding there were such lands, or town lots, the fourth condition of the compact might have a beneficial operation to save them from forfeiture, and may have been inserted with that view; or this abundant caution, thinking it more prudent to guard against forfeitures, for six years, by stipulation, than to rely on the then recently adopted provisions of the constitution of the United States. I am inclined to believe, that there were lands, or town lots, at the date of the compact, titles to which depended upon, cultivation and improvement. If so, the fourth condition of the compact had reference to these exclusively; and all ground of inference favorable to the power of forfeiting lands differently situated, is taken away, so far as it depends upon the said fourth condition. I have observed that the proclamation of 1763 speaks of “conditions of cultivation and improvement.” I have not deemed it important to make a thorough examination in order to find a class of lands on which the fourth condition of the compact would operate exclusively, for if there were no such lands it would not alter my opinion.
The patent to Harvie, made the subject of forfeiture in this case, was founded on land office treasury warrants, and these were granted in consideration of money paid into the public treasury. The patent upon its face is unconditional, and purports to grant or convey the land in consideration of land warrants. J think the act *488 in question violates that clause in the constitution of the United States which prohibits every state in the union from passing laws impairing the obligation of contracts, and likewise that clause in our state constitution which declares, that no law impairing contracts shall be made. That the steps taken by Harvie to obtain the patent, and .the issuing thereof to him, amounted'to a contract between him and the state, can admit of no doubt. The point is settled alike by reason and authority. Fletcher vs. Peck, 6 Cranch, 87; 2 Cond. Rep. 308; New Jersey vs. Wilson, 7 Cranch, 164 ; 2 Cond. Rep. 467 ; Town of Pawlet vs. Clarke &c. 9 Crunch, 292 ; 3 Cond. Rep. 422 ; Dartmouth College vs. Woodward, 4 Wheaton, 518. These decisions of the supreme court fully establish the position, that the modes adopted by the state governments, whether ordinary letters patent, or acts of assembly, for granting titles to the unappropriated public domain, are contracts within the meaning of the constitution of the United-States. The contract in the present case, as intended by the parties, was this, that Harvie and his heirs or assigns should enjoy the land granted, forever, in consideration of so much paid to the state for land warrants. The mode and manner of enjoyment was not prescribed ; they were therefore left to the volition of the grantee. His dominion was not limited at the time of his purchase The use to which he should apply the property, to administer to his happiness, was not then designated. In these matters he was left, by the contract, free. He had, as a free man, all those rights and privileges which constitute the birthright of-an American citizeni The effect of the act in question is to change the tenure and the contract. Tiiat which was before unconditional, is now made to-depend upon a condition, to wit, the clearing, tending and belting land, by a given day; that which before was to be subject the dominion of the grantee, his heirs and assigns forever, in consideration of so many land warrants purchased and paid for, shall not now be subject to them forever, unless they will increase the consideration on their part, and do a certain quantity of labor in a specified time ; that which before was to be held forever, subject to the *489 absolute use of the proprietor, according to his unrestrained pleasure, is now to be taken a.\ay and given to another, unless he uses it in a particular manner, to tvhich he may be entirely averse. In a word, that which was a source of happiness and enjoyment, under the contract as originally made, is now, under the new conditions and restrictions which have been, or may be made, a source of uneasiness and trouble, if not of unqualified misery. It is my opinion that the constitutional provi-ious referred to, were intended to prohibit the states from producing such results by meddling with contracts. If an individual, after selling land, was to claim the right of resuming the title, unless his vendee would submit to new conditions, one universal exclamation would denounce his claim as presumptuous, arbitrary and groundless. In matters of contract, I cannot find two rules, one for states, the other for individuals. They must both share the same fate.
Some suppose, that the legislature has power to make the failure to improve, as required by the act of 1824, a crime or penal offence, and to enforce the forfeiture as a punishment. Were such position correct, then I should be of opinion, that a direct, judicial investigation and conviction of the offender would be necessary, before the forfeiture could be enforced. In such case, the commonwealth should be a party. The constitution, fourth section of the fourth article, prescribes imperatively, that “all prosecutions shall be carried on in the name and by the authority of the commonwealth of Kentucky, and conclude against the peace and dignity of the same.” So long as this clause of the constitution is regarded and enforced, it seems to me, that a grievous penalty cannot be collaterally imposed upon a citizen, on the trial of a civil action. If it can be done, then a citizen is punished without being prosecuted in the manner required by the constitution.
I am unwilling, however, to concede, that the legislature can, under the pretext of promoting the interest of the state, control and direct the citizsn in the use he shall make of his private property. 1 subscribe to the maxim sic utere tuo, ut aliemim non Icedas; and 1 admit *490 the power to punish for an injury done to individuals ■ or the public. But I deny, that the legislature can constitutionally prescribe, under color of preventing public or private mischief, the quantity of labor the citizen shall perform on his farm, the kind of improvements he shall make, and the time within which they must be constructed. The toleration of such power on the part of the government, would be conceding to it the right of controlling every man, and directing what road he shall travel in the “pursuit of happiness.” Thus the freedom of the citizen would be lost in the despotic will of the government, and, under the semblance of liberty, we should have the essence of tyranny.
The act of 1824, now in question, does not treat the failure to improve as therein required, as a criminal or penal offence. The forfeiture is not placed upon the ground of punishment for a criminal act of commission or omission ; but the whole tenor of the statute shews, that the legislature conceived they had constitutional power to require the citizen to improve his land, as a condition upon which it should be held. It is an attempt to change the tenure of the property — to make the holding depend upon the improvement as a new condition annexed to the estate, instead of letting it rest upon the original contract. The grantor undertakes to direct the manner of using the property, as a condition upon which the grant shall remain effectual. If this new condition is allowed, the contract, as made, cannot stand. No man purchases land either from the state oran individual in fee simple, without taking and holding it untrammelled in the manner of using it. The very object, in making the purchase, is to obtain the exclusive control, and to get clear of any control over it by the vendor. The attempt, thereafter, by the vendor, to resume the control, is in violation of the manifest purpose and design of the contract, and strikes at its essence.
Those constitutional provisions which were intended to shield the property and contracts of the citizen, were considered in the case of Davis vs. Ballard, 1 J. J. Mar. 566, by this court. It was there determined, that the legislature had no power to take the property of one cit *491 izen am] transfer it to another, or to apply it to public use, without the consent of his representatives, and without just compensation being previously made to him. It is unnecesary to repeat here the'arguments made use of in the opinion delivered in that case. The conclusion from them is still approved. The act .of 1824 provides for taking away the land, but makes no provision for paying the owner a just compensation. '1 he principles settled in Davis as. Ballard denounce the act as unconstitutional.
If the pover to forfeit lands for nonimprovement exists, it would only require an act prescribing irksome or impossible conditions, to strip the citizen of all his property. In regard to the power, there is no difference-between real and personal estate. In the nature of things, there is as much propriety, it seems to me, in forfeiting a horse to the government, because his proprietor does not curry and rub him well, or break him to labor gently in the gear, as there is in forfeiting land because the owner does not choose to dear and cultivate a part, and deaden the trees growing on another part. Such interferences on the part of the government with the private affairs of individuals would ever be a source of discontent, if they were expressly tolerated by the constitution. Their obvious impolicy is a strong reason in favor of the conclusion to which I have arrived. The members of .the convention, anxious to place the enjoyment of life, liberty, and property, upon secure foundations, cannot well be imagined to have left all property subject to the absolute and arbitrary control and disposition of the legislature.
I intend no disrespect to the legislature, in supposing that impossible conditions might be prescribed, in times of excitement, for the purpose of forfeiting estates. That has been done in the act in question. The rights of infants, femes covert, and persons of unsound mind are saved, and two years are allowed after their disabilities are removed, to make the required improvements. But there is no saving in behalf of the weak and decrepit, who cannot labor, and who have no means of hiring others to work for them. It is morrally impossible for persons thus situated, who have no property but the *492 land adversely possessed by others,-to escape the forfeiture. The first three sections of-the act relating to champerty &c. would prevent the proprietor from sel-lirtg anv part of his claim, to enable him to pay laborers tor im|)roving the balance.
But again, the claimant out of possession has no legal right to enter foreiblv upon the land held adversely by the occupant; and if he should so enter, he may be put out by the summary remedy given for a forcible entry. How can he improve as the act requires, when the general laws of the land wilt not allow him to enter with force &c. to retain possession long enough to do the work if he does enter ? To obtain a judgment ©r decree in favor of the better claimant, out of possession, by suit, and thus to get possession by writ of habere faci-as, in time to'do the work required, by the 1st of August, 1825, in many cases, was impossible. There may, therefore, be many claimants who,- with every disposition to comply with the requirements of the act, to save their lands from forfeiture, could not possibly do it-. The operation of the act, if enforced, upon such persons, would he more severe, in relation to their property, than an attainder for treason or felony could he inadé, under any judicial proceedings which the legislature might authorize. The twentieth section of the tenth article of the constitution declares, “that no attainder shall work corruption of blood ; nor, except during the life of the offender, forfeiture of estate to the commonwealth ” Thus, by comparing the act of 1824 with ■ the constitution, I find that while the legislature are expressly prohibited from passing laws to forfeit the estates of attainted traitors and felons, except during life, thev have undertaken to forfeit forever the estates of those who have been guilty of no crime, unless it he a crime to have the better title to a tract of land held adversely- hv another ! This contrast fortifies mv conviction that the legislature do not possess the power to pass a hill of forfeiture like this. When the estate of a tainted felon can only he forfeited during life, is it not, within the contemplation of the supreme law, an excessive fine or a cruel punishment to forfeit forever the estate of a *493 man, merely because he is unwilling and fails to improve it, even if he could? The constitution says, “that excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.”
Thus far I have considered the operation of the act of 1824 in relation to conflicting claims; but there is still another view which I think will place its unconstitutionality in a more palpable light. The eighth section forfeits every tract of land in the state of more than one hundred acres, unless it be improved as required, by the time specified. The last clause in the act provides, that “a citizen proprietor actually residing on, or in possession of, one of his surveys, shall not be compelled to cultivate or improve a second or other survey or tract, on which there is no conflicting claim or adverse title.” Thus the wealthy who resides on one tract, owning many, saves all. But the man or woman who owns only one tract, and is too poor to improve that, and is compelled to rent, or live in, the house of another, loses, by the forfeiture, all they have, notwithstanding it may not be interfered with. If, however, the person owning land, and not residing upon his own, is not so poor, but has more than one tract, then he is required to improve each of his tracts, even if they amount to a hundred in number, although there may be no interference with any of them. Thus it is, that onerous burdens are put upon one citi-izen, whilst another is exempted, upon no other ground of distinction between them, tban that one lives on his own land, and the other does not. I find no warrant in the constitution for such partiality between citizens. I will not consume time by enquiring, whether the act, so far as it attempts to make a distinction and a difference between citizen proprietor residing on their own lands, and nonresidents, citizens of other states, residing on their own lands, is not in violation of the first clause of the second section of the fourth article of the constitution of the United States, which declares that “ the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states.”
I have heard it contended, that' the acts passed with a view to secure compensation for improvements to occu *494 pants, cannot be sustained on constitutional grounds, if 'the power to forfeit for nonimproveinent is denied. I have heard it contended, that the act of 1824 was constitutional, because, when the effect of the tenth section is considered, it is no more than an auxiliary to en. force the acts to secure compensation for improvements. These two ideas I will briefly examine.
The acts to secure compensation to the evicted occupant for his improvements, are nothing: more than a remedy to enforce the performance of a duty enjoined by every principle of natural justice. The bona fide occupant who converts the wilderness into a.farm, renders the land more valuable by the addition of his improvements. Tise question in'such a case, is, shall the successful claimant profit bv the labor and expenditures of the occupant, bv getting them for nothing, or shall he make compensation ? Justice answers, that no one, without paying a consideration, or contracting to do so, shall be enriched bv the loss of another. Hence the successful claimant is bound in conscience to make compensation for improvements which cost him nothing, hut which may have cost the occupant much toil and monev. Our occupant laws reduce this moral dutv to a legal obligation. Independent of our statutes, the chancellor, acting upon the basis of natural equity, would secure to the bona fide occupant, the value of his ameliorations. The statutory remedy afforded relief for the same thing, according to a rule prescribed bv legislative, instead of judicial power. The occupant pavs, in improvements, a consideration for the compensation secured. 411 this mav he done, I think, without, rendering u invalid and insecure” the “ right and interest'1'' of the successful claimant in and to the land. And, therefore. T think our occupant laws do not conflict with the third condition of the compact with Virginia. But these arguments which address themselves with force to my mind, are destitute of weight when applied in support of an act of forfeiture. What consideration, or henefit, does the owner of the estate receive for the loss of it, bv forfeiture for nonimproveinent ? None. How is he enriched by the labor of another ? Not at all. What moral duty is he under to surrender *495 au estate fairly purchased and paid for ? None whatever. I cannot, therefore, perceive the shadow of analogy between a law which secures compensation for improvements made in good faith, and a law which forfeits the estate, without a crime, and transfers it to another, who is not required to pay the owner one tent. The principles aiui opeiation of a law to forfeit land, and a law to secure to occupants the value of improvements, are altogether dissimilar; and, theieiore, 1 cannot perceive how they are so connected that they must stand or fall together.
I admit that the tenth section of the act allows the claimant to escape the forfeiture by argreeiug to comply with certain laws therein enumerated ; which laws have always been enforced by this court. As an auxiliary to enforce the occupant laws, there was no necessity lor the passage ol the act of Jb24, as it' related to the state courts. The act was intended to operate, as its preamble shews, upon litigants in the ledetal courts. How far a state can, by its legislation, change the course of decision in the federal courts, when no change is effected in its own tribunals, is a question .not necessary to lie disposed of here. At present, I am only concerned to shew, (hat there is no soundness in the idea which supposes, that the act in question is constitutional in consequence of the aid afforded the occupant laws previously enacted. As already stated, no aid was given to those laws before the courts of Kentucky, by the act of ib24, and none could be given by it, because those laws were enforced in all the tribunals of Kentucky before the act of 1824 was passed. It must be the effect which the act of 1824 will have in the federal courts, in counteracting the principles settled in the case of Grten &c. vs. Biddle, which must identify it wi.h the occupant acts, and give to it the same degree of constitutionality which they possess. Whether it will have any effect in tfie federal courts, belongs to them to determine. But let it operate as it may in these courts, I think it can be clearly shewn, that its operation there cannot reconcile it with the constitution. The decision of the supreme court in Green vs. Biddle, is either light or wrong. If right, *496 then the act of 1824 was conceived for tire purpose of thwarting what is right; but if wrong, then the act was designed to overturn error, or to guard against its consequences.
i consider the question, first, upon the supposition, that the decision of the supreme court is right. That being granted, how'does it stand? Thus. Tt is. right that the claimant should recover his laud without paying for improvements, as required by the occupant laws. But the legislature having the power, if the act of 1824 is constitutional in its forfeiting fe'atures, says to to the claimant., “you shall not. recover, your land shall be forfeited, unless you consent to pay your adversary for certain improvements he has made upon it.” Í think the claimant might reply, “ the principles of your constitution forbid you to hold such language to me. You propose that- I shall pay for justice. I do not ash it at the hands of your courts, but if you have the right to prescribe a rule for the courts where I apply for redress, I deny that you can, without violating a salutary provision of the constitution under which you act, force upon me the terms you propose. Your constitution says,. 1 right and justice shall be administered, without sale, denial or delay-’ I will not purchase justice by paying for improvements which--the highest judicial tribunal known to our common country, has decided I am not bound to pay for.” It seems to me, that it - is nothing less than a sale of justice, to require the man who seeks it, to pay, or to agree to pay, a sum. to his adversary, which it is admitted, under the view I am now taking, he is not bound by law to pay. In this light, the act of 1824> makes the administration of justice depend upon a bargain, and sells justice, not for a bribe-paid to its makers, but for a consideration to be paid to the occupant. Jus-tice is sold, in my opinion, within the meaning of the constitution, whenever any thing valuable is required of either of the parties litigant to be-paid, or secured to be paid, at a future day, as a condition upon which their complaints shall be heard, and their controversies decided upon their merits. I would not embrace, by the rule, tax on law process, or any thing else paid or secured, *497 when provision is made for its restoration, or an equivalent, in the event of a successful termination of the suit. But where a party is required to pay in order to get justice, and the sum paid is to be lost forever, without a possibility of indemnity, it amounts, as I conceive, to an inhibited sale of justice. The tenth section requires, that he who '■'■desires to litigate his claim” shall file his engagement, under hand and seal, to the occupant, stipulating to comply with the act of Slst Jannary, 1812, &c. “before suit commenced, or before judgment rendered where suit has already been commenced,” to wit, ' at the date of the act of 1824. If the decision of the supreme court be right, the act of 1824 is a palpable attempt to coerc e the better claimant to purchase justice, and it prescribes the price at which the federal courts are to sell it. I have heard it said, that the clause of the constitution which prohibits the sale of justice, was merely intended to operate upon the judiciary, and to restrain corrupt practices with judges. I give it no such limited construction, but extend it to all the departments of government, and would enforce it, as one of those great fundamental principles essential to the welfare of society.
I proceed, in the second place, to consider the question upon the belief that the supreme court is wrong. That admission may induce us to think favorably of the motives of the legislature ; but it cannot remove my objections. Suppose this court was to give an erroneous decision greatly beneficial to one class of the community, and equally prejudicial to another, and the legislature should undertake to counteract the error, by putting those whom it benefitted upon terms. Imagine, for example, that the legislature had been dissatisfied with the decision, which holds the assignor responsible to the assignee, upon his failure, on due diligence, to collect from the obligor ; suppose the legislature had undertaken to obviate the effects of the decision and error of the court, by enacting, that no assignee should bring suit upon the bond, or obtain judgment against the obligor, until he had filed a release to the assignor, acquitting him ■ of all responsibility — could the legislature defeat *498 the effect of the decision by such an act ? I think not. Such a law would be selling justice to the assignee, if he complied with the act, or denying it altogether, if he refused. The price paid for a judgment against the obli-gor, would be the value of the release to the assignor. In the case stated, the legislature might change the rule, so that future-assignments would impose no obligation' upon the assignor; but such change could not operate upon vested rights under previous contracts. These would necessarily be disposed of according to the erroneous decision, unless the, court abandoned it. The misfortune in the case of our occupant laws, is, that the legislature of Kentucky has no power, without the consent of Virginia, to alter the rule as to cases which may’ hereafter occur. Her hands are tied by the construction put upon the compact by the supreme court. Virginia has refused to give her consent. Under these circumstances, revolution, or acqniesence in the decision of the supreme court, are the alternatives presented to Kentucky. And whether the decision he right or wrong, cannot change or effect the character of the act of 1824.
But again, are not all acts of the legislature, passed with the intention to frustrate or countervail a judicial decision, and not to change the law as it may operate on new cases, encroachments upon the judiciary, and usurpations of power ? u No person or collection of persons, being of one of the departments of government,. shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted,” is the language of the' constitution. The legislature has no power to revise, annul, or counteract a decision of this court, much less one of the supreme court. If the law, as expounded by the judiciary, is not consistent with the public will, it is the province of the legislature to alter it in regard to new cases ; but the legislature has no power to say, this or that judicial sentence is erroneous, and therefore we will alter it. I do not mean that the opinions of the judiciary are too sacred for legislative investigation. On the contrary, I hold that the legislature may investigate the opinions of judges with a view to render them re-- *499 sponsible for1 corruption, by impeachment, or for ignorance, by address and removal. Indeed, I think every citizen lias a right to arraign at the bar of public reason, every judicial opinion. What I mean is this, that according to the organization of our government, the legislative department transcends it power whenever it undertakes to thwart or counteract the judgment or decree of a court of competent jurisdiction. It cannot do this directly, without trampling upon the constitutional functions of the judiciary. It cannot do indirectly that which could not be done by,direct action. A careful examination of the act of 1824, has satisfied my mind, that all its provisions for forfeiting lands were intended to thwart and counteract the decision of the supreme court, and are so far, an unconstitutional interference with- the legitimate operations of another department.
I have endeavored to shew, that the legislature cannot constitutionally forfeit land, because the owner will not clear it, or build houses of brick or stone, or ornament it with gardens, &c. &c &c. If I am right in that position, I cannot perceive how it is possible to malvé the forfeiture constitutional by regarding it as the means to accomplish a desirable end. I do not subscribe to the doctrine, that the end will justify the means, either in law or morals. The congress of the United States have power “to make all laws which shall be necessary and proper for carrying into execution any power expressly granted.” The congress are expressly prohibited from laying a tax, or duty, on articles exported from a state. Now, it would be strange legislation, and palpably unconstitutional, I think, for congress to tax articles exported from a state, assuming as a justification for so doing, that it was necessary and proper to raise a revenue. One clause of the constitution cannot thus be made to overrule another. Effect must be given to the whole. So if it be unconstitutional to forfeit lands for noriiin-provement, and be constitutional to pass laws securing compensation to occupants for their improvements, the unconstitutionality of the forfeiture cannot be got over, upon the pretext that the forfeiting act is necessary and proper to sustain constitutional laws against erroneous *500 judicial opinions. The prohibitions and limitations of power contained in all our constitutions are but mockeries, if they can be evaded by such shallow reasoning. The legislature could not constitutionally enact, that the life of one citizen should be offered up as a sacrifice, if thereby the quarrels of nations could be reconciled, and the calamities of war brought to an end.. The end will not consecrate the means.
I shall notice one idea more in defence of the act, and only one. It is the appeal made in the preamble to the sovereign power of tlie stale. I do not admit that there is any sovereign power, in the ii'era! meaning of the terms, to he found any where in our systems of government. The people possess, as it regards their governments, a revolutionary sovereign power: but so long as the governments remain which they have, instituted, to establish justice and “to secure the enjovment of the right of life, liberty and property, and of pursuing happiness sovereign power, or, which I take to be the same thing, power without limitation, is no where to he found in any branch or department of the government, either state or national ; nor indeed in all of them put together. The constitution of the United States expressly forbids the passage of a bill of attainder, or ex post fac-to lato, or the granting of any title of nobility, by the general or state governments. The same instrument likewise limits the powers of the general government to those expressly granted, and places many other restrictions upon the power of the state governments.— The constitutions of the different states likewise contain many prohibitions and limitations of power. The tenth article of our state constitution, consisting of twenty eight sections, is made up qf restrictions and prohibitions upon legislative and judicial power, and concludes with the emphatic declaration, “ that every thing in this article is excepted out of the general powers of government, and shall forever remain inviolate ; and that all laws contrary thereto, or contrary to this constitution, shall be void.” These numerous limitations and restrictions prove, that the idea of sovereign-i;i in government^ was not tolerated by the wise foun- *501 tiers of our systems. Sovereign stats'” are cabalistic words, not understood by the disciple of liberty, who has been instructed in our constitutional schools, it is an appropriate phrase when applied to an absolute despotism. I firmly believe, that the idea of sovereign power in the government of a republic, is incompatible with the existence and permanent foundation of civil liberty, and the rights of property. The history of man, in all ages, has shewn the necessity of the strongest checks upon power, whether it be exercised by one man, a few, or many. Our revolution broke up the foundations of sovereignty in government; and our written constitutions have carefully guarded against the baneful influence of such an idea henceforth and forever. I cannot, therefore, recognise the appeal to the sovereignty of the state, as a justification of the act in question. Hence 1 conclude, that the circuit court erred in refusing to give'the third instruction asked for by the plaintiff, and- in giving the first asked for by the defendant.
A tenant in common cannot recover upon a joint demise. Instruotion 3, p. -IfiS.
The third instruction given on the application of the defendant, was correct. Harvie conveyed the entire tract patented to him to Barrett and William Duvall, as tenants in common, and not as joint tenants. Barrett conveyed his moiety to Gaines. The declaration contains a joint demise in the names of Barrett and Duvall. It contains no separate demise in the name of Duvall. As the title was traced from the patentee down to Du-vall and Gaines, if Duvall could not recover, the instruction was correct. That he could not recover upon a joint demise, being but a tenant in common, is too well settled by authority to be disturbed or discussed. See Innis &c. vs. Crawford, 4 Bibb, 241 ; Miller &c. vs, Hoy &c. Ib. 568.
As there could be no recovery except on the demise in the name of Gaines, the enquiry whether Duvall’s interest had been forfeited for a failure to pay taxes, or to list it for taxation, was entirely irrelevant, and only served to incumber the case, Í therefore deem it useless to notice the instructions on either side upon that subject.
A cause maybe reversed for erroneous instructions, notwithstanding the ver diet may appear to be right upon the proof.
Jud^e Nicholas’ Opinion.
It has been insisted, that if the circuit court erred in deciding one or more points of law, still there should he no reversal, because it is clear, that Buford was protected by the settlement and residence of his tenants on the land for seven years before suit was instituted. Buford’s protection by the statute of limitations depended upon the testimony. The jury were the proper judges of the facts. I cannot tell what influence the errone* ous instructions of the court, relative to the act of 1824> may have had upon the minds of the jury. Therefore, I am for reversing the judgment and giving a new trial, upon which the forfeiture contemplated by the act of 1824 shall not prejudice the plaintiff.
I have detected no error in the instructions given in relation to the settlement and residence of Buford’s tenants. '
• It is therefore considered by this court, that the judgment of the circuit court he reversed, with costs, and the canse remanded for a new trial, upon which the act of 1824, so far as it purports to forfeit the title of Gaines, for nonimprovement, must be disregarded, and in other respects, the trial conducted in conformity to this opinion.
Judge Nicholas
: — The only question presented in this case, upon which I care to make any comment, is, ■whether the title of Gaines to the land in contest, was forfeited to, and vested in, the commonwealth, by reason of his noneompliance with the requisitions of the eighth section of the act of January, 1824, a npncompliance with which by the 1st of August, 1825, is therein declared to forfeit all title to land in this state, and immediately vest the same in the commonwealth, without judgment, or office found.
The'whole question turns upon the power of the legislature so to his title; for, if the power exists, there is no doubt it has been exercised.
The power cannot be claimed on the ground of an original condition, attached to the grant of the land from Virginia, that it should be improved within any prescribed time. There was no such condition express *503 or implied ; nor is there any reasonable pretext for con-' tending that tliere was. Neither can it with propriety be said, that any act oí' the governments of Virginia or Kentucky has added, since the issuing of the patent, or could have added any such condition to it. The paten-tee having held the title free from any such condition at the time of the adoption of the federal constitution, no act of either government, or of both of them combined, could, thereafter, superadd that, or any other new term, to the contract growing out of the patent, without the assent of the patentee. The federal constitution, at its adoption, clothed the contract with an inviolable sanctity that could not be infringed by any legislation of either of the states, or by any compact thereafter entered into between them. For nothing can be better settled by authority than that an executed contract, such as a grant, comes as fully within the constitutional protection, as any executory contract, and that it makes no difference that a state is one of the parties to the contract.
If the act in question be, as it is assumed in argument to be, a mere naked resumption of the land by the state, or a simple declaration that the title should be taken from the claimants and vested in the state, there can be no dispute that it falls directly within the inhibition against laws impairing the obligation of contracts. It would be a violation of the contract of the plainest and most palpable character. Or if, as is contended, the patent gave the patentee such perfect and absolute dominion over the land, as took from the commonwealth all power of thereaiter controlling him as to its use, or nonuser, or the mode of its use, then it must also be conceded, that the act impairs the obligation of the contract, by attaching terms and conditions to the enjoyment of the properly, from which the patentee was exempt by the stipulations of the original grant. But I do not feel prepared to treat the act as any such mere arbitrary resumption of the title, or to concede that the patent carried with it any such absolute surrender of the commonwealth’s ulterior right of dominion over the land. The act enjoins upon the proprietors of all land claims within the state, by a named clay, to make mani- *504 lest and knit their claims to the soil, by making the improvement therein prescribed; and on failure therein, forfeits all such claims to the commonwealth. I am not prepared to say that it was a part of the terms of the contract, either express or implied, that the legislature should never pass such a law, or that the land granted should perpetually remain exempt from forfeiture, for the violation by its proprietor of any of the penal enac-tions of the state, or that there was any implied condition appended to the contract, that will prevent the gov-, ernment in all time to' come, from controlling the proprietor of the land in its use or nonuser, or in the mode of its use. That doctrine would carry us a great way. How far it would carry us, it is impossible at once to foresee. The mind cannot, at a single effort, cast itself over the whole circumference of its extension. It is not" sufficiently clear to my mind, that it will not go far enough to cripple and curtail powers, that are essential and indispensable to all governments. The doctrine should be approached and handled with great caution and circumspection. According to my view of the subject, the question to be decided, can be disposed of without determining that point; and I shall, therefore, forbear to express any positive opinion upon it.
Conceding that the act in question c^oes not. impair the obligation of the contract, there is still left an important and most difficult question : that is, whether, under the constitution of Kentucky, the legislature has the power of denouncing forfeiture as the penalty for not improving land. It is a question about which different opinions may well be entertained. There are clauses of the constitution, taking the compact with Virginia as a part of it, which have a strong bearing both ways. The case, however, does not necessarily require a decision of that question either. My opinion of the effect of the act upon Gaines’ title is made up on other and different grounds.
To escape the objection that the act is a violation of the contract growing out of the patent from Virginia, it is indispensible that the act should be treated as enjoining a duty on land proprietors, and then, for the failure to *505 perform that duty, prescribing the penalty of forfeiture, as a mode of enforcing obedience to the legislative command. ft is, therefore, a highly penal law ; and if the power of the legisla'ure to prescribe such a penalty for such an offence be conceded, it is still very material to enquire, whether the manner in which it is attempted to be enforced, is allowed bv the federal and state constitutions. This? court has been compelled, on several occasions, to denv the validity of legislative enactments, because of their being attempts to exercise admitted powers in an unconstitutional manner.
If the title of Gaines ha* passed to the state, it did so on the 2nd of August, 1825, by the mere force and effect of the words of the art of 1824. The question is, could the act so pass the title ?
By an article of the Kentucky constitution, which is the foundation of the whole superstructure, the powers of government are divided into three distinct, departments, and confided to separate- bodies of magistracy : those which are legislative to one, those which are executive to another, and those which are judiciary to a third, with a declaration that no person or persons being of one of those departments shall exercise any power properly belonging to either of the others. It is of the last importance, to the purity of our institutions, that this division of powers should he preserved, and this barrier against the encroachment of one department upon another should he properly kept up. Will it not be broken down, if the act of 1824 is permitted to divest Gaines of his property, and give it to the state without any judicial proceeding against, him — without any judicial condemnation for the alleged offence, and without even an office found ?
At common law, where lands were forfeited for any offence by the owner against the laws of society, no title vested in the sovereign until conviction ; and exen after conviction, his title was eonside e<l as inchoate o I/, until office found. Such also was the rule, as a; ted on by English courts, where the forfeiture was prescribed by an act of parliament. It is true that parliament might, in its omnipotence, dispense with a conviction and of- *506 flee alfog tber, h"t this was seldom, if ever done. Such an act would constitute only an extraor 'inarv ex* eplion to the general rule. The uniform practice in the ordinary ease, for centuries, points out and dis ruminates with éuffi ient distinctness the boundary line between legislation and adjudication on this subject, as it must have been understood bv the framers of the constitution.
To enjoin what shall be done, and what left undone, and to secure obedience to the. injunction by prescribing appropriate penalties, belongs exclusively to legislation. To ascertain a violation of such injunction, and inflict the penalty, belongs to the judicial functions. To command the improvement to be madp, and declare forfeiture of title as the penalty for failing to make it, in the manner they are done by the act of 1824, is pure legislation. To ascertain that Gaines had not made the required improvement, and thereupon condemn his title as forfeited to the state, belong not properly to legislation, hut to adjudication.
The sixth section of the tenth article of the constitution savs, the ancient mode of trial by jury shall he held sacred, and the right thereof remain inviolate. To what class of cases does this apply, and where is this right to remain inviolate, if it be not where the citizen is pursued for an infraction of the penal laws ? What law is so penal excepting those affecting life and liberty, as this which forfeits a man’s real estate — which takes from G-iops, for a single omission of duty, twelve thousand acres of land ?
The tenth section of the same article provides, that, in all criminal prosecutions, the accused hath a right to he heard by himself and counsel ; to demand the nature and cause of the accusation against him ; and, in prosecutions by indictment or information, a speedy public trial, bv an impartial jury of the vicinage ; and that he. shall not he deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. Does not this clause require, that for every offence which incurs so heavy a penalty as the forfeiture of a man’s estate, he should be publicly prosecuted, and not liable to con *507 demnation, unless by the judgment of his peers, in a due and regular course of legal, judicial proceeding.
The clause is almost a literal transcript from an article of magna charta, which has uniformly received that construction. Lord Coke, 2 Inst. 50, gives, as the settled construction and true meaning of the words “ or by the law of the land,” in magna charta, “ without due process of law, so that no man be taken, imprisoned, or put out of his freehold, without due process of law ; that is, by indictment or presentment of good and lawful men, &c. &c.” “ Against this ancient and fundamental law,” says he, “I find an act of parliament made, that justices, (without any finding, or presentment of twelve men,) lipón a bare information, should have power to hear and determine all offences committed against any statute. By color of which act, shaking this fundamental law, it is not credible what horrible oppressions and exactions, to the undoing of infinite numbers of people, were committed by Richard Empson and Edmund Dudley, being justices of the peace throughout England.” Such also, is the signification given to the words, the law of the land, by the most eminent American jurists, See 2 Kent’s Com. 10 ; 3 Story’s Commentaries on the Constitution, 661, and 1 Tuck. Blk 304,
In the case of Ely vs. Thompson, 3 Mar. 74, it is intimated, that this clause of the constitution contemplates more kinds of public or criminal prosecutions than those which are carried on by indictment or information. But, as is there said, it evidently secures the right of being heard, of obtaining the nature and cause of the accusation, and of confronting t.he witnesses, in any mode of prosecution, for any offence or crime against society. In Enderman vs. Ashby, Pr. Dec. 65, it was decided, that the act of .1792, prohibiting traffic with slaves, and authorizing the owner to recover four times the value of the thing bought or sold, was unconstitutional, because it did not secure the accused in his right of trial by jury. In Carson vs. Commonwealth, 1 Mar. 290, it was held, that the county courts could not inflict the fine and treble tax, authorized by the act of 1810, for giving in a false list of taxable property, because the constitution secured *508 to the party his trial by jury, he having had a right ¡to it, as the law stood at the adoption of the constitution. And in Olds vs. Commonwealth, 3 Mar. 467, it was held that a person prosecuted for failing to give in a list of taxable property, was under the protection of this clause sf the constitution, and entitled to be heard by himself and counsel.
It would seem, therefore, not merely from the apparent import and spirit of the constitution, but from the settled construction given to its language by these concurring authorities, that Gaincs'was entitled to a hearing, and some mode of trial by a jury, before his property could be taken from him for this alleged violation of law, in failing to make the required improvement.
The forfeiting act passed in January, 1824, and the improvement was required to be made on or before the 1st of August, 1825, At both periods, the land in contest was in the adversary possession of Buford. It is believed, that no degree of diligence would have enabled Gaines to have got into possession under a judgment in ejectment, and made the required improvement within those periods, provided the case had been appealed to this court. If this be the fact, then-the act is obnoxious to censure, as repugnant to the spirit of that clause of the constitution which prohibits the passage of ex post facto laws. Prior to this act, there was no law requiring the improvement to be made or prescribing a penalty for not improving. If, then, sufficient time was not allowed Gaines to turn the occupants out of possession by due course of law, and make the required improvement, it was the same to him, in effect, as if the act had allowed only a day, or no time at all, for making it. An act of the latter description, though it might not fall literally within the definition of an ex post facto law, yet it would come fully and completely within the reason and policy of the inhibition against the passage of such laws.
The prohibition of the federal constitution against the passage of bills of attainder, is also deemed to have an important bearing on this question.
*509 Bills of attainder are said by Woodeson, in his lectures, to be acts of the supreme power, pronouncing capital sentences, where the legislature assumes judicial magistracy ; and bills of pains and penalties those which inflict milder punishments. But it is believed that, bill oj attainder is a generic term, comprehending both description of acts. Such, at least, is believed to be its true signification, as used in our constitutions. Thus it is said by the supreme court, in Fletcher vs. Peck, 6 Cranch, 138, “ a bill of attainder may affect the life of an individual, or may confiscate his property, or both.” So also, it is said by Judge Tucker, in his edition of Blackstone, volume 1, page 292, “ bills of attainder are legislative acts, passed for the special purpose of attainting particular individuals of treason, or felony, or inflicting pains and penalties beyond or contrary to the. common law.” That the term should be received in the large sense thus given to it, is consonant with the true republican character of our institutions. A condemnatory act of the legislature inflicting upon an individual, or class of individuals, pains and penalties, is as much within the reason of the prohibition, as if it inflicted capital punishment. They are both equally hostile to the principles of civil liberty and the-spirit of our written constitutions. They are cquallv engines of tyranny and oppression, and equally unsuited to the government of a free people.
Understanding, then, the term hill of attainder as embracing bills of pains and penalties, the act in question would seem to fall under this inhibition. That it is a highly penal law, inflicting a most grievous penalty for the omission of the thing commanded to be done, is beyond dispute. But it is not the weight of the penalty, nor the character of the offence, that makes it a bill of attainder. But it is the confiscation of the property of individuals, which it attempts to make, before any condemnation, and without any condemnation, for the of-fénce designated, either in persnam, or in rem, When the state rightfully acquires the property of a citizen by forfeiture, it, is, as the punishment annexed, by law, to some illegal act, or negligence of its owner. That *510 the legislature may make the act or omission illegal, and, prescribe forfeiture as the penalty, is admitted. But it is denied, that it can of itself inflict the punishment. So far as the act in question undertakes to divest the title out of Gaines, and vest it in the state, it is a legislative infliction of the penalty, it is an assumption, to that extent, of judicial magistracy, without affording the accused the benefit of those forms and guards of trial, which are his constitutional right, whenever he is sought to be punished, either in his person, or by forfeiture of his property, for alleged violations of the penal enactions of tlie state.
The legislature mav, no doubt, make a forfeiture relate back from the time of conviction, and take effect from the time of the offence committed ; but this power by no means necessarily carries with it the right to su-percede the necessity of a conviction, in order to make the forfeiture take effect. The right to forfeit is an incident merely to the power to punish guilt. Without the guilt, the forfeiture cannot be incurred. The guilt cannot be ascertained by the legislature, nor otherwise than by a direct criminal procedure of some sort, and a judicial determination thereon, ’ '
Bills of attainder have generally designated their victims by name; but they may do it also, by classes, or bv general description fitting a multitude of persons.' Either mode is equally liahle to moral and constitutional censure. Thev have generally been applied to punish offences a!readv committed ; but they have been, and mav be, applied to the punishment of those thereafter to be committed, or for criminal omissions thereafter incurring. A bill of attainder is not necessarily an ex post facto law. A British act of parliament might declare, that if certain individuals, or a class of individuals, failed to do a given act bv a named day, they should be deemed to be, and treated, convicted felons or traitors. Such an act comes preciséis within the definition of a bill of attainder, and the English courts would enforce it without indictment or trial bv jurv ; the prisoner when brought to the bar,, being merely asked what he *511 has to allege why execution should not be awarded against him.
It is unnecessary to say whether either of the several clauses of the constitution referred to, would, singly, be sufficient to invalidate the act; and I do not wish, therefore, to be understood as saying that either of them would. Rut that some, or all of them together, do invalidate it, I feel no doubt. They all tend to shew that the legislature cannot, in this mode, by any mere act of its own, divest a citizen of his property. They constitute together, in letter, spirit and general scope of policy, a mass of obstacle to the divestiture of Gaines’ title, in the manner contemplated, which to my mind is perfectly insurmountable, and which compels me to concur in saying the title is still in him, and that the act of 1824 is no obstruction to his recovery.
It is no satisfactory answer to these suggestions, that the question of forfeiture is adjudicated upon bv a court of justice, and that Gaines has had a public trial, before a jury, in this action of ejectment. He was there defending no plaint of the commonwealth ; there was no accusation against him, at the instance of the commonwealth, of which be was notified, and called upon to defend ; nor was the jury sworn to try an issue between them. It was no prosecution, “ carried on in the name and by the authority of the commonwealth of Kentucky.” The question of forfeiture and divestiture of title came up collaterally only. It was used as part of the defendant’s case, to shew that the plaintiff’s title had theretofore, before the institution of the suit, passed from him and vested in the commonwealth. 1 he forfeiture was the result of nothing done in that suit. The verdict and judgment formed no condemnation upon which to base it, and from which it could follow as an incident. They were themselves but the result of a forfeiture theretofore incurred, and of a divestiture of title which had theretofore taken place. The court and jury were not a mean for carrying into effect what the legislature had commanded, but acted upon what it was supposed the legislature of itself had already done. The title passed from Gaines on the second of August, 1825„ *512 Jong before Ibis trial, or it is still in him. If the act of itself conic! direst him of his title, it was competent for the legislature to have directed it to be regranted to another person, and that person could, upon the title so acquired, have evicted Gaines, provided lie had subsequently obtained the possession, with the same propriety that the statutory forfeiture can now be relied upon to defeat his recovery.
Nor will these suggestions be answered, by the obvious difficulty, if not impracticability, of enforcing the forfeitures by direct criminal proceeding against such a host of unknown and unascertainahle delinquents. If the power attempted to be assumed is a wholesome one, and was wisely and equitably exerted in the given instance, it will be matter of regret that other and higher considerations induced the framers of the constitution to withhold from the legislature the power of giving such wholesale and summary redress. If, on the contrary, the existence of such power would he noxious to the common weal, and its exercise in tiiis instance was oppressive, unwise, unequal and unjust, then it will be matter for congratulation, that the wisdom of the constitution has secured the community against such extensive oppression, and that the very extent of the evil intended, is of itself a security against its perpetration. Men will rejoice, or regret, on this subject, according to their different views of the wisdom and justice of this act. But with that we have nothing judicially to do. We must test its validity without regard to the presence or absence of those qualities
By the tenth section of the act of 1824, the plaintiff or claimant is allowed to avoid the whole effect of the forfeiture denounced in the preceding sections, provided he will file an agreement to abide by and conform to the occupant laws ; and by a settled course of decision in this court, the occupant laws referred to in the tenth section, are none of them infractions of the constitution, the decision of the supreme court in -the case of Green vs. Biddle to the contrary notwithstanding. It may, therefore, be asked, cui bono declare the law unconstitutional, at the instance of a perverse litigant, who *513 could have shielded himself from its whole effects, by merely agreeing to do what he would equally have been bound to do whether he made such agreement or riot. If the act had simply required such agreement to be filed before suit brought, under the penalty of dismissal, or refusal to afford relief, there would have been much difficulty in making out any satisfactory reasons for refusing it obedience. The objection that what it required was idle and useless, would amount to nothing on the question of its validity. It would require from him the surrender of nothing of value that was his. Tor it would be a most uneanonical, illegal surmise, that his privilege of carrying the case to the supreme court, and the chance of his obtaining there a decision against the validity of the occupant laws, was of any value. Those laws are, or are not, constitutional. As they now are, the one or the other, so they must remain. The decisions of this court, since that of Green vs. Biddle, went upon the hypothesis of its being improvident, ill-advised, and that it must be taken back whenever the point is again presented to the supreme court. Upon any other hypothesis, the whole course of the later decisions of this court upon that subject, are entirely unwarranted and indefensible. It is, therefore, an inadmissible surmise, for any purpose of administrative justice, to suppose the supreme court ever will do otherwise than affirm those laws as constitutional.
But the scope and effect of the act of 1824, is not confined to a refusal of relief, in any suit to be brought, unless the claimant will make the agreement to abide by the occupant aws. It does not aim to effect its ends by any such process. It denounces a forfeiture and confiscation of title, for failing to improve, and if allowed to take effect in that way, it will forever bar and preclude the plaintiff from any future action, though he might be willing to make the agreement as required. As it cannot take effect in that way, it must be held inoperative, both upon his title and his suit.