264 So.2d 529

**Samuel BROWN, alias**

**v.**

**STATE.**

**6 Div. 128.**

Court of Criminal Appeals of Alabama.

Jan. 26, 1971.

Rehearing Denied March 2, 1971.

**306**

Michael J. Romeo, Billy Church, Birmingham, for appellant.

MacDonald Gallion, Atty. Gen., and Joseph Victor Price, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

First degree murder: sentence, death by electrocution.

I

Brown, Irving Crawford and Gloria Jean Cannon left her home early in the morning May 4, 1969, in Crawford's car and drove to the cargo yard of Mercury Freight Lines. There Brown and Crawford stole a carton purporting to contain a power lawnmower. An employee of the freight line, Buster Williams, tried to stop them but Crawford chased him off with a pistol.

While Williams went to alert the watchman, Azell Harris, Brown and Crawford put the box in the trunk of the car. Harris chased them on foot. Crawford driving with his head down to avoid Harris's shots hit a post, then a railroad track.

There he and Brown got out shooting at Harris who in the meantime had caught up with the stalled car. Harris was shot in the head and died from this wound.

## II

The jury was qualified in accordance with Witherspoon v. Ill., 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. We have set out the trial judge's interrogation in the Appendix hereto. See also Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed. 2d 433; Jackson v. State, 285 Ala. 564, 234 So.2d 579; Seibold v. State, 287 Ala. 549, 253 So.2d 302, (December 17, 1970); and Howard v. State, 287 Ala. 435, 252 So.2d 304, (December 17, 1970). We find no error.

## III

■ In undertaking the Witherspoon examination, the prosecuting counsel used the expression "regardless of how nauseating the evidence might be." Objection to this term was overruled. See Appendix.

First, the use of the subjunctive "might" left the sickening quality of the evidence a matter to be determined. Second, any homicide can be viewed as nauseating. Third, the statement was not made in argument. We find no error.

## IV

After the evidence was closed, defense counsel objected to the deputy district attorney's argument. The record shows:

"(Thereupon, Mr. McDonald continued addressing the jury, in opening argument, on behalf of the State, during which the following proceedings were had and done:)

"MR. CHURCH: May it please the Court, we are going to object to the reference to other crimes that are not before this Court.

"There is only one crime in this indictment, and we ask that Mr. McDonald re-

strict himself to the crime in the indictment.

"THE COURT: What was the statement? I was working on my notes. I'm sorry.

"MR. McDONALD: I said 'A burglary, or robbery,' and I said something to the effect that he wouldn't need dynamite in a robbery, but, in a burglary, he could, to blow a safe, or get some door open, or something of that nature.

"I don't know exactly.

"THE COURT: I overrule the objection.

\*    \*    \*    \*    \*    \*

"MR. CHURCH: May it please the Court. I am going to object to the statements made by Mr. McDonald, wherein he says that on this day you can save my daughter's life, my husband's life, or my wife's life, as being outside the realm of issues in this case, and intended to inflame the minds and passions of the jury.

"THE COURT: Overrule.

"MR. CHURCH: We except."

■ The argument as to the dynamite was within the legitimate inferences of the evidence.

■ As to the second quotation, this too would seem in bounds where, as here, there was an exchange of fusilades on a public street. Furthermore, we also could uphold the lower court's ruling under Supreme Court Rule 45.

## V

We do not consider the remarks above quoted as to the possible use of the dynamite to break and enter as referring to another crime separate and distinct from the one which led to Azell Harris's death.

The carrying of the dynamite on the larcenous expedition could lead to the inference that it was preparatory to being

used to break and enter if the opportunity arose or the exigencies of the situation demanded.

## VI

■ The State did not undertake to prove the market value of the lawnmower. The court below charged as to grand larceny's being a felony. This was in the course of charging (see Code 1940, T. 14, § 314) that homicide committed in perpetrating robbery was first degree murder.

Our felony murder provision does not embrace larceny without violence or threats thereof. Hence, defining larceny simpliciter was irrelevant other than to explain the deceased's right to protect Mercury Freight Line's property and cargo.

Defense counsel took no exception to this instruction before the jury retired. Hence, no error arose.

## VII

■ Along with his motion for new trial, defendant filed an affidavit which states that in closing argument the Deputy District Attorney said:

" 'Now if you (meaning the jury) make a mistake here, God in His wisdom will see that it is corrected later on.' "

However, the record is barren of any showing that the remarks were called to the court's attention before the jury retired. Without the trial judge having the occasion to rule on the propriety of invoking Divine Intercession, we are not called on to determine the question.

This argument is not within the scope of the Automatic Appeal Act of June 24, 1943. The plain error doctrine of § 10 of that Act refers only to "testimony."

## VIII

■ The jury had the case submitted to it on December 10, 1969, and found Brown

guilty of first degree murder and fixed his punishment at death. On December 12, 1969, the trial judge, after allocutus pronounced judgment of guilt and sentence. The date of execution was set for February 26, 1970.

Upon notice of appeal being given, the court below suspended execution of the sentence pending decision of this Court.

Appeal under the Act of June 24, 1943, supra, is mandatory. Certiorari from this Court is considered by the Supreme Court "as a matter of right." Supreme Court Rule 39, as amended December 14, 1970.

Code 1940, T. 15, § 325, as amended, provides (in part):

"The only legal punishments, besides removal from office and disqualification to hold office, are fines, hard labor for the county, imprisonment in the county jail, imprisonment in the penitentiary, which includes hard labor for the state, and death by electrocution. * * *."

Code 1940, T. 14, § 318, provides (in part):

"Any person who is guilty of murder in the first degree, shall, on conviction, suffer death, or imprisonment in the penitentiary for life, at the discretion of the jury; * * *."

However, by closing Kilby Prison, the executive arm of the State has had taken from it the means of lawfully killing Brown by electrocuting him. The death chair which can only be energized at Kilby no longer has a home there.

Execution of a death sentence is detailed in Code 1940, T. 15, §§ 343–356, being Article 6 of Chapter 17 of that Title. Particularly, from § 348,[1] Kilby Prison alone is the legally specified place of execution.

Under Act No. 678, September 1, 1965, as amended by Act No. 103, April 11, 1967,

---

1. "The execution shall take place inside the walls of Kilby Prison at Montgomery, in a room arranged for that purpose. It shall be the duty of the department of corrections and institutions of this state to provide the necessary room and appliances to carry out the electrocution as provided in this article."

the Legislature has taken Kilby Prison from the Board of Corrections and transferred it to the Alabama Correction Institution Finance Authority, § 22, Act No. 678, supra. Under § 24 thereof the Board of Corrections was authorized to lease other facilities from the Authority on a year to year basis.

The land and premises of Kilby Prison were deeded pursuant to said Act No. 678 to the Authority June 23, 1967. The electric chair was dismantled and the last of the prison inmates were moved to other parts of the penitentiary system, the last leaving January 21, 1970.

Kilby Prison was imploded with dynamite and is now completely razed.

On July 21, 1970, the Attorney General advised the Governor that the execution of a "death sentence may take place only inside the walls of Kilby Prison in Montgomery. * * * [I]n the absence of statutory authority * * * execution may not take place at the Holman Prison in Atmore." Op.A.G.,Quarterly Rep. July—Sept., 1970, Vol. 140, p. 11.

Blackstone, citing Coke, Finch and Hale, points out that execution of a death sentence is justifiable homicide only if carried out as the law requires it. The mode must be that prescribed:

"* * * If an officer beheads one who is adjudged to be hanged, or vice versa, it is murder: (i) for he is merely ministerial, and therefore only justified when he acts under the authority and compulsion of the law: but if a sheriff changes one kind of death for another, he then acts by his own authority, which extends not to the commission of homicide; and besides, this license might occasion a very gross abuse of his power. The King, indeed, may remit part of a sentence; as in the case of treason, all but the beheading; but this is no change, no introduction of a new punishment; and in the case of felony, where the judgment is to be hanged, the King (it

hath been said) cannot legally order even a peer to be beheaded. * * *."

Thus, in our jurisprudence in Ex parte Pearson, 59 Ala. 654, it was held that a sentence to hard labor could not be executed by confinement in the county jail. Moreover, there the Supreme Court reversed a lower court judgment which remanded the prisoner to *await* the County Commissioners' arranging his being hired out. The Supreme Court relieved the petitioner "from further imprisonment."

In White v. State, 134 Ala. 197, 32 So. 320, the principle applied in *Pearson,* supra, was ascribed to (1) unreasonably long detention by the sheriff and (2) the neglect of the county commissioners in providing a place for hard labor confinement. In *White,* supra, the prisoner was ordered to be immediately delivered to the penitentiary authorities rather than to be kept in the county jail pending an appeal without suspension of sentence.

In Kirby v. State, 62 Ala. 51, Brickell, C. J., in explicating the rationale of *Ex parte Parson,* supra, remarked, "The law would not sanction * * * *a sentence dependent on matter of fact to be ascertained subsequently by an executive officer."* (Italics added). Continuing the opinion states:

"* * * The sentence of a court must clearly express the punishment the convict of crime is to suffer, and when it is so expressed, the sentence is authority for the infliction of that punishment only, and not for the infliction of another and different punishment. * * *."

See also Aaron v. State, 40 Ala. 307.

In Webster v. State, 47 Fla. 108, 36 So. 584, the Florida Supreme Court in similar vein wrote:

"9. Section 2947, Rev.St. 1892, requires that sentences in capital cases shall 'be executed within the walls or inclosure of the jail or prison where the prisoner may be confined'; and a sentence that the

defendant 'be taken by the sheriff * * to the yard surrounding the common jail * * * then and there' hung, is not in accordance with the statute, and is error for which the judgment and sentence will be reversed, and the cause remanded for a proper sentence.

"(Syllabus by the Court.)"

We do not think that the instant anomaly is governed by Code 1940, T. 1, § 11, as a case where the penalty for the offense was altered after commission of the offense. Rather the death penalty has been suspended as effectually as if the Legislature had enacted that no electricity may be inside the penitentiary system. See Price v. Moyer, 288 F. 269, where apparently a delay in execution ensued from a delay in appropriations.

The principal problem which here rises to constitutional proportions stems from the suspended animation of Brown's decreed electrocution. The next regular session of the Legislature convenes in May 1971. One extraordinary session has already gone by since Kilby Prison was closed. Acts 1969–70, Vol. III, p. 2595 et seq.

The result is that Brown has a molecular Sword of Damocles suspended to fall *if and whenever* the Legislature amends § 348, supra.

Is this indefinite suspension permissible if revival were to restore the means of executon? We think not because of the joint inhibitions against ex post facto laws and against cruel and unusual punishments. Constitution, U.S., Art. I, § 10, cl. 1, Amendments 8 and 14; Constitution, Ala. 1901, §§ 7, 15, and 22.

New York by Ch. 489, Laws of 1888, provided for electrocution as the punishment of death. Applying this punishment to a convict who committed a crime March 29, 1889, i. e. after the effective date of the act did not breach the inhibition against ex post facto laws. In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519.

Taking up the cruel and unusual punishment question the court remarked:

"* * * Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous,— something more than the mere extinguishment of life."

Our Supreme Court has said, citing the *Kemmler* opinion:

"* * * Punishments are cruel when they involve torture or a lingering death; * * * *" Boykin v. State, 281 Ala. 659, 207 So.2d 412.

"However, 'the punishment of death' or imprisonment for life is neither unusual nor cruel, within the meaning of the Constitution, where the crime for which punishment is imposed is malevolent and proximately causes the death of a human being, *so long as the death inflicted is speedy, and without undue pain or torture.* * * *." (Italics added). Lee v. State, 227 Ala. 2, 150 So. 164.

Perhaps our Founding Fathers were trying to compress into the phrase cruel and unusual punishments some of the rather extreme means of the law of treason in England. We quote from Kenny's Outlines of Criminal Law, (17th Ed.), § 419, p. 371:

"Treason, like all felonies, was punished with death. But the execution of a traitor was accompanied with special circumstances of horror, to mark the supreme heinousness of his crime. Instead of being taken in a cart to the scaffold, he was drawn to it on a hurdle, hanged only partially, cut down alive and then disembowelled, beheaded and quartered. The head and quarters were permanently exposed in some conspicuous place, after being boiled in salt to prevent putrefaction, and in cummin seed to prevent birds pecking at them. But

the form of sentence in treason was not quite invariable, and the King often remitted everything excepting the beheading. In later times, even where there was no such remission, the executioner usually took it upon himself to make the strangulation fatal (technically an act of murder, ante, § 94). At last it was enacted, in 1814, that the beheading and quartering should not take place till after the prisoner had been put to death by hanging. (Women were never beheaded or quartered, but were burned.) And finally in 1870 by the Forfeiture Act all the exceptional features of execution for treason were abolished, except in cases where quartering or beheading may be ordered by royal warrant. For by the Act of 1814 the Crown has still power to order, by warrant under the sign manual, that any male who has been sentenced to be hanged for treason shall be beheaded. The judge, however, cannot appoint any mode of death but hanging. In treason (as in all capital crimes except murder), the common law rule which permits executions to take place in public still holds." (footnotes omitted)

Where a Phillipine convict was sentenced, inter alia to fifteen years cadena, i. e. to be staked out like a grazing cow, the Supreme Court had no trouble in finding the punishment disproportionate to the crime and, hence, a breach of the Eighth Amendment. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793.

Physical cruelty is not alone condemned; mental torture also is prohibited. The withholding or delay of actual physical force is a recognized device either of punishment or inducement to confess. In the *Thousand and One Nights,* it is the frame of the narratives which kept the storyteller alive. To Christians, crucifixion epitomizes the lingering torture—both physical and spiritual.

Statelessness was rejected in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed. 2d 630. There the plurality opinion (at p. 102, 78 S.Ct. at p. 599) said, "The threat makes the punishment obnoxious."

In People v. Chessman, 52 Cal.2d 467, 341 P.2d 679, the Supreme Court of California went into considerable detail to demonstrate that Chessman's long detention pending execution of his sentence of death was not due to unreasonable delay by the state. Therefore, the state had not imposed cruel or unusual punishment on him.

Here, however, the State asks us to (1) either ignore the plain mandate of Code 1940, T. 15, § 348 or (2) allow the defendant to be kept until the Legislature shall have had an opportunity to amend that code section. At argument, the State orally cited an Indiana case, Keith v. State, 157 Ind. 376, 61 N.E. 716, said to fit the first alternative above.

The Indiana Court in *Keith,* supra, however, refused to consider the question of changing the law as to the place of execution. This because Keith's motion for new trial did not have a ground touching thereon. Under Code 1940, T. 15, § 389, we are under no such narrow stricture. The error here is apparent on the record.

Had our electrocution statute been worded like that in Georgia[2] as shown in Benton v. State, 187 Ga. 149, 199 S.E. 749, we would have no problem. There the court correctly pointed out that the sentence of the law is not a contract between the convict and the state within the meaning of Article 1, § 10, Cl. 1, of the Constitution of the United States.

In Lindsey v. Washington, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182, the court said:

"* * * The Constitution forbids the application of any new punitive measure to a crime already consummated, to the

2. "* * * within the walls of the State penitentiary, at Millegeville, * * * or *wherever the State penitentiary may be located."* (Italics added).

detriment or material disadvantage of the wrongdoer. * * *.

" * * * It could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change. Marion v. State, 16 Neb. 349, 20 N.W. 289. * * *."

See also Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648, (ex post facto: "3d, Every law that * * * inflicts a greater punishment than was annexed to the crime when committed."); *Medley*, Petitioner, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835.

"And can any substantial right which the law gave the defendant at the time to which his guilt relates be taken away from him by *ex post facto* legislation, because, in use of a modern phrase, it is called a law of procedure? We think it cannot."— Kring v. Missouri, 107 U.S. 221, 232, 2 S.Ct. 443, 453, 27 L.Ed. 506, (5–4 court).

Here we have no repeal of former punishment such as was present in *Medley*, supra. Rather the Legislature by abolishing Kilby Prison has deprived the executive branch of the means of lawfully killing the convict.

Thus, there has resulted an enlargement of the period of confinement prior to the actual execution. In Rooney v. North Dakota, 196 U.S. 319, 25 S.Ct. 264, 49 L.Ed. 494, the court said:

"The giving, by the later statute, of three months' additional time to live, after the rendition of judgment, was clearly to his advantage, for the court must assume that every rational person desires to live as long as he may. * * *

"However, material the place of confinement may be in case of some crimes not involving life, the place of execution, when the punishment is death, within the limits of the state, is of no practical consequence to the criminal. On such a matter he is not entitled to be heard."

It is clear that Rooney was given a definite time of additional life before death. Brown has only the uncertainty of an obsolete statute which may or may not be cloaked in a resurrection body to take him across the River Styx.

In 1947 the Supreme Court had the problem of multiple electrocutions to carry out a single death sentence. In State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed 422, where there had been a power failure or weakness at execution, the plurality opinion stated:

" * * * The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution. The situation of the unfortunate victim of this accident is just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block. We cannot agree that the hardship imposed upon the petitioner rises to that level of hardship denounced as denial of due process because of cruelty."

The dissenting opinion states, in part:

" * * * It is unthinkable that any state legislature in modern times would enact a statute expressly authorizing capital punishment by repeated applications of an electric current separated by intervals of days or hours until finally death shall result. The Legislature of Louisiana did not do so. The Supreme Court of Louisiana did not say that it did. The Supreme Court of Louisiana said merely that the pending petitions for relief in this case presented an execu-

tive rather than a judical question and, by that mistake of law, it precluded itself from discussing the constitutional issue before us.

"In determining whether the proposed procedure is unconstitutional, we must measure it against a lawful electrocution. The contrast is that between instantaneous death and death by installments— caused by electric shocks administered after one or more intervening periods of complete consciousness of the victim. *Electrocution, when instantaneous, can be inflicted by a state in conformity with due process of law.* In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519. The Supreme Court of Louisiana has held that electrocution, in the manner prescribed in its statute, is more humane than hanging. State ex rel. Pierre v. Jones, 200 La. 808, 9 So.2d 42, certiorari denied 317 U.S. 633, 63 S.Ct. 64, 87 L. Ed. 510. See also, Malloy v. State of South Carolina, 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905.

"The all-important consideration is that the execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself. Electrocution has been approved only in a form that eliminates suffering." (Italics added)

State of Louisiana ex rel. Francis v. Resweber, supra, was, of course, before Robinson v. Calif., 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, which first applied the "cruel and unusual" punishment prohibition of the Eighth Amendment to the states via due process clause of the Fourteenth Amendment.

This was foreshadowed by In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 and State of Louisiana ex rel. Francis v. Resweber, supra. See Anno., 33 A.L.R. 3d 335, particularly § 3(c).

After *Robinson,* supra, in Jackson v. Bishop, 8 Cir., 404 F.2d 571, Judge (now Mr. Justice) Blackmun in outlawing flogging as penitentiary discipline wrote, in part:

"The principal opinion in Trop v. Dulles, supra, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed. 2d 630 (1958), although it commanded the votes of only four justices a decade ago, is, in our view, particularly pertinent. The issue was the validity of a federal statute which would denationalize a native born citizen who deserts the military service in time of war and is convicted thereof by a court-martial and dismissed or dishonorably discharged. The opinion provides guidelines and overtones which we feel safe in regarding as illustrative of the general thinking of a majority of the justices on the subject today. The opinion casts aside the death penalty 'as an index of the constitutional limit on punishment,' for it 'has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty.' 356 U.S. at 99, 78 S.Ct. at 597. The Eighth Amendment's basic concept 'is nothing less than the dignity of man' and assures that a state's punishment power 'be exercised within the limits of civilized standards.' Fines, imprisonment, and even execution may be imposed 'but any technique outside the bounds of these traditional penalties is constitutionally suspect.' 356 U.S. at 100, 78 S.Ct. at 498. The scope of the Amendment is not 'static.' It 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' 356 U.S. at 102, 78 S.Ct. at 598. Virtually all the world's civilized nations refuse to impose statelessness as punishment for crime. 356 U.S. at 102, 78 S.Ct. at 598.

"From that opinion we glean a recognition of, and a reliance in part upon, attitudes of contemporary society and comparative law. And the emphasis is on man's basic dignity, on civilized precepts, and on flexibility and improvement in standards of decency as society

progresses and matures. Finally, it is 'any technique' outside the traditional bounds which 'is constitutionally suspect.'"

## IX

## Conclusion

As Mr. Justice Blackmun, when on the Eighth Circuit, remarked in Jackson v. Bishop, supra, each case involving cruel and unusual punishment contrary to the mandate of the Constitution rests on its own facts. Hence, we shall recapitulate.

First and foremost, Brown under the judgment does not know and will not know from day to day until some court—State or Federal—says the State of Alabama has (or has not) delayed too long in bringing him to the electric chair. This uncertainty constitutes psychological cruelty. Moreover, it is unusual. Aaron v. State, 40 Ala. 307.

■ Second, death by electrocution is to be swift. In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519. Here the bolt is swift but wait is unknown.

Third, the delay so far is not (as was the case in Price v. Moyer, supra) attributable to Brown. The Automatic Appeal Act, § 2 wisely or unwisely—granted (indeed, forced on him) an appeal to this Court. The time of execution originally set has expired; any new resentencing would be de novo. See Aaron v. State, supra; c. f. Washington v. Dowling, 92 Fla. 601, 109 So. 588.

Fourth, the failure of past legislatures to supply the lapsus calami of 1965 so as to keep a viable system of electrocution, has atrophied the death penalty pro tempore.

Finally, to renew this penalty now or later would be ex post facto or cruel and unusual,[3] or both. Medley, Petitioner, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835.

Having concluded that the death sentence is legally invalid, we now take up the disposition of the case.

At common law, public hanging by or under the direction of the sheriff was the usual death penalty—treason aside. No matter how much hanging might be thought to be educational, deterrent, retributive and permanently isolating, nevertheless, under the usual standards of statutory construction, we consider that the retention of § 325, T. 15, and of § 318, T. 14, Code of 1940,[4] stands as a declaration of legislative policy against a relapse into hanging by the neck until dead.

The death penalty having been indefinitely put aside, and the alternative of hanging not being valid, we meet the question of the tertium quid. This triternitive is life imprisonment.

The statute to punish first degree murder (§ 318, T. 14, Code 1940) gives the jury the discretion to assess life imprisonment or life extinction. Though the death penalty has been put on the shelf, still there remains the punishment of life imprisonment in the penitentiary. After the dismantlement of Kilby Prison and the electric

---

3. Swift electrocution (see In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519) was discussed by Holmes (then C. J.), in In re Storti, 178 Mass. 549, 60 N.E. 210, and distinguished from fire. He distinguished between a means to kill and a means to cause other pain as well as to kill. C. f. crucifixion.

4. Capital offenses in Title 14, 1940 Code:

| | |
|---|---|
| Kidnaping for ransom | § 7 |
| Arson, 1st degree | § 23 |
| Arson, 2nd degree | § 24 |
| Burglary, 1st degree | § 85 |
| Exploding dynamite near occupied building, etc. | § 123 |
| Murder, 1st degree | § 318 |
| Murder by life convict | § 319 |
| Rape | § 395 |
| Carnal knowledge by drug | § 397 |
| Carnal knowledge of girl under 12 years | § 398 |
| Carnal knowledge by falsely personating woman's husband | § 400 |
| Robbery | § 415 |
| Train Robbery | § 416 |
| Treason against State | § 424 |

chair, life imprisonment legally was the only punishment tied to a finding of guilt of first degree murder.

It results, therefore, that the judgment below is due to be modified here by one showing a sentence of life imprisonment in the penitentiary.

Modified; affirmed as modified.

ALMON, J., dissents.

### APPENDIX

"MR. McDONALD: All right. Ladies and gentlemen, as His Honor did, I will address all of you collectively, but if any of these questions affect you, please answer out as if they were being addressed to you individually.

"Please don't sit back and say, 'Well, nobody else is raising their hand, so I won't.'

"Please just answer out as if there were just the two of us having a conversation, you, individually, and myself.

\*    \*    \*    \*    \*    \*

"Are there any among you who have a fixed opinion against capital punishment, that is, punishment by death in the electric chair?

"(Thereupon, some of the jury venire raised their hands, and the following proceedings were had and done:)

"MR. McDONALD: That is Mrs. Marlin and Mrs. Nabors and Mrs. Littlefield.

"A JURY VENIREMAN: May I clarify what you mean by 'fixed' (sic)?

"MR. McDONALD: Well, you are one of the extras now.

"And Mr. Wright. That is Mr. Wright?

"A JURY VENIREMAN: Yes, sir.

"MR. McDONALD: Any others in the three panels?

"Let me ask you this, and I address this to all of you: Are there any among you who know right now, in the innermost part of your heart that you would never, under any

circumstances, regardless of what the evidence was, regardless of how great the weight of the evidence, regardless of how nauseating the evidence might be—

"MR. CHURCH: I object to the use of the term 'nauseating evidence.' That is getting out of line.

"THE COURT: Overrule.

"MR. CHURCH: We except.

"MR. McDONALD:—if you know right now that you would never, under any circumstances, be able to return a death verdict against this or any other defendant?

"A JURY VENIREMAN: Raise your hands?

"MR. McDONALD: Yes.

"(Thereupon, some of the jury veniremen raised their hands, following which the following proceedings were had and done:)

"MR. McDONALD: Your Honor, in that event, the State would like to challenge for cause.

"THE COURT: Let me get my questions out before I rule on it. I want to ask it in another way.

"MR. McDONALD: All right, sir.

"(Thereupon, the Court left the bench, went into the Court's chambers, and, upon his return, the following proceedings were had and done:)

"THE COURT: Now, of the entire group, on the whole panel, whether it be those who raised their hand, or not, you heard the last question that Mr. McDonald asked you.

"Now, I have to rule on this, on his challenge of those jurors, and, before I rule, I want to ask you this question in this way:

"In the event that you are selected as one of the jurors to hear the evidence and to determine the guilt or innocence of the defendant in this case; and further in the event that defendant is found to be guilty of murder in the first degree by the jury, would you be willing to consider all of the

**316**

penalties provided by state law—and that includes capital punishment—without being irrevocably committed, before the trial has begun, to vote for or against any penalty provided by law regardless of the facts and circumstances that might emerge in the course of the trial and proceedings?

"Would your answer be the same to that on any of you? All right, let's have a showing of hands

"(Thereupon, some of the jury venire raised their hands, following which the following proceedings were had and done:)

"THE COURT: In the event you are selected as one of the jurors to hear the evidence and to determine the guilt or innocence of the defendant in this case; and further, in the event that the defendant is found to be guilty of murder in the first degree, would you be willing to consider all of the penalties provided by state law—and that includes the penalty of death—without being irrevocably committed, before the trial has begun, to vote for or against any penalty provided by law—and that includes the death penalty—regardless of the facts and circumstances that might emerge in the course of the trial and the proceedings?

"You would not? All right, let's have the hands. Keep your hands up, those of you who say you wouldn't.
"You had your hand up awhile ago. Does your hand still remain up?

"A JURY VENIREMAN: Definitely, I wouldn't.

"THE COURT: You put your hand up awhile ago, didn't you?

"A  I was scratching my head.

"THE COURT: Please don't scratch your head when I am having a show of hands.

"Who was it on this panel?

"MR. McDONALD: Just one.

"THE COURT: Would your conscientious scruples against, or opposition to the death penalty, invariably compel you to vote against capital punishment?

"If it would, please let me see your hands again.

"(Thereupon, some of the jury veniremen raised their hands, and the following proceedings were had and done:)

"THE COURT: Are there any of you, in the event that the defendant was found guilty of murder in the first degree by the jury, who would be irrevocably committed to vote in favor of a death penalty, regardless of the facts and circumstances that might emerge in the course of the trial and proceedings?

"All right, now, as I understand it, there are three ladies and one man that raised their hands in reply to the question asked by both the district attorney and the Court.

"I understand there is a challenge for cause?

"MR. McDONALD: Yes, sir.

"THE COURT: Let's take them one at a time.

"MR. CHURCH: May it please the Court, could I ask them one special question before we proceed?

"THE COURT: Yes, sir, I guess so.

"MR. CHURCH: I just wanted to ask you, that raised your hand in regard to capital punishment, are you aware of the fact that there are other punishments?

"Are you aware of the fact that there is an alternative to capital punishment?

"A JURY VENIREMAN: Yes, sir.

"THE COURT: What would the materiality of that be?

"MR. CHURCH: It seems like these jurors are confused.

"THE COURT: It doesn't seem like they are confused to me. They say thay have a fixed opinion against capital punishment. That is the question.

"If you have any other questions in regard to that that might shed some light on that, all right.

"If you want to go further on, then, when it becomes your turn, and question them on the basis, if any of them have an irrevocable feeling about giving the death penalty, all right.

"I don't see whether they know if there are other punishments, or not, would have anything to do with their feelings about capital punishment.

"These people are subject, at this point, to challenge for cause.

"MR. CHURCH: That is the reason, I feel like there is a real doubt in the minds of the jury.

"THE COURT: I am not going to permit argument. Certainly, there are more penalties for murder in the first degree. The punishment could be, in the event of conviction, life imprisonment in the penitentiary for murder in the first degree.

"That has no bearing on whether or not they are opposed to the death penalty.

"MR. CHURCH: That is what I wanted them to know, Your Honor.

"THE COURT: Would that make any difference in your stand, ladies and gentlemen, about the—the fact that there can be two possible punishments for murder in the first degree, of life imprisonment in the penitentiary, for life?

"Do any of you change what you stated before, since that has been stated to you?

"Let's go back, now. What is your name, please, Ma'am?

"A Mrs. Marlin.

"THE COURT: All right. Betty Jean Marlin.

"Gentlemen, I am going to have to roll some of you. Would you take a seat up (indicating), Mrs. Marlin, by this gentleman (indicating) on the front bench?

"Herbert Marshall Boyd. Mr. Boyd, before I seat you, you had some question there a few minutes ago?

"THE JURY VENIREMAN: I was asking him to clarify what he meant by 'fixed opinion.'

"THE COURT: After he re-worded his question, and I did the same, do you think you know what we mean?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: Did you state that you did not have a preconceived fixed opinion?

"Would you have the seat that was just vacated, please?

"THE JURY VENIREMAN: Yes, sir. Do you want my name and address at this time?

"THE COURT: Yes, sir, I think this will be a good time for that.

"THE JURY VENIREMAN: Herbert Marshall Boyd, 756 Meadowbrook Drive, engineer, Alabama Power Company.

"THE COURT: All right. What is your name, please, ma'am?

"A JURY VENIREMAN: Mary Louise Nabors.

"THE COURT: Mrs. Nabors, if you will, please have a seat by Mr. Marlin, here (indicating).
"Leon Bradley, did you hear the question you were asked about capital punishment a few minutes ago?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: Do you have a feeling about capital punishment that, had you been on the regular panel, rather than the extra panel, that would cause you to raise your hand, that is, that type of preconceived opinion as to capital punishment?

"THE JURY VENIREMAN: I didn't raise my hand.

"THE COURT: I know you didn't. I am trying to find out if you have a fixed opin-

ion. Did you hear the questions about whether or not you had a type of fixed opinion against capital punishment that would cause you, in the event of a finding of guilt for murder in the first degree, to vote against the death penalty, because of a preconceived opposition, or feeling, against the death penalty?

"Do you have such a feeling?

"A  No, I don't.

"THE COURT: Then, let me put it to you this way: If you were selected on this jury, and in the event there is a finding of guilt of murder in the first degree in this case, would you be willing to consider all the penalties provided by law, without being irrevocably committed, before the trial has begun, to vote for or against any penalty provided by law, regardless of the facts and circumstances that might emerge in the course of the trial and proceedings?

"Would you be willing to do that?

"THE JURY VENIREMAN: No, sir.

"THE COURT: You wouldn't? Then, you feel like you do have some type of pre-conceived—not some type, but you do have a fixed opinion against capital punishment?

"THE JURY VENIREMAN: Yes.

"THE COURT: You do?

"MR. McDONALD: State challenges for cause.

"THE COURT: All right

"MR. CHURCH: Your Honor, we want to except to that ruling.

"THE COURT: All right. Let me be sure I understand:

"Would your feeling against or your opposition to the death penalty irrevocably compel you to vote against capital punishment? Would it or wouldn't it?

"One time you said 'No,' and then you said 'Yes.' I have got to rule on it, and I don't know how to rule.

"Let me ask you this: Do you have a fixed opinion, feeling, against punishment by death?

"THE JURY VENIREMAN: I think your point is not giving—

"THE COURT: I can't understand you. I don't know what you said. You said, 'I don't think—,' and I didn't hear the next two or three words.

"Did any of you hear him?

"A JURY VENIREMAN: No, I don't think so.

"THE COURT: You don't think you have a fixed opinion against capital punishment? "Let me ask you this: If you are selected as a member of this jury, and, in the event the jury should return a verdict, or a find-ing of guilty of murder in the first degree, and the two punishments were life imprisonment in the penitentiary, or death, do you feel like you would—that you have such an opposition to the death penalty that you would, under any circumstances, always vote against punishment by death because of that feeling, or do you feel you would be able to listen to the evidence and to the law, and the way everything took place, and, then, if there was a finding of guilt, would be willing to consider all of the pen-alties, without just disregarding any of them, without giving them any considera-tion, or thought?

"THE JURY VENIREMAN: I would rather listen to the evidence.

"THE COURT: You would rather listen to the evidence, and you think you could fairly and impartially sit in judgment on what the punishment should be, without ex-cluding any of it, is that right?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: Your name is Leon Brad-ley?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: All right. Would you come up to the next row in front of you and take the seat that the lady just vacated?

"Do you see that seat in front of you, that broad space?

"That is Leon Bradley.

"What is your name, please, ma'am?

"A JURY VENIREMAN: Judy Littlefield.

"THE COURT: I believe you had your hand raised? Would you come up and have a seat on this bench?

"I understand there was a challenge on all four of them?

"MR. McDONALD: Yes, sir.

"THE COURT: Henry Wayne Markham. Mr. Markham, you heard the questions that have been asked these past few jurors, concerning their feeling about capital punishment.

"Do you understand what I was asking them?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: Do you have such an opposition to capital punishment, or the death penalty, that would cause you to raise your hand on that?

"You do have an opposition to that, that I spoke of?

"THE JURY VENIREMAN: No, sir.

"THE COURT: All right. Please take the seat just vacated by Mrs. Littlefield.

"That is Henry Wayne Markham.

"Your name was Wright, wasn't it?

"A JURY VENIREMAN: Yes, sir.

"THE COURT: Would you please stand up?

"(Thereupon, the jury venireman stood up, following which the following proceedings were had and done:)

"THE COURT: You understood the questions I asked the jurors?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: Do you have that opposition to capital punishment I spoke of?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: You understood the rest of the questions, and you do have that type opposition to it?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: All right, take a seat, here (indicating).

"Mary Lou Olive, do you understand the questions that I asked?

"THE JURY VENIREMAN: Yes, sir.

"THE COURT: Do you have an opposition to the type of punishment I spoke of?

"THE JURY VENIREMAN: No, sir.

"THE COURT: All right, take a seat on this bench, here (indicating).

"Now, let me ask you this: I am not suggesting anything, but, in the course of this type of questions sometimes a person understands a little better as we go along. They get to thinking, and they say, 'I wish I had raised my hand.'

"I am not encouraging anything, but is there anything on this. that you have thought over it and thought that your proper answer should be that you raise your hand on that question?

"All right, thank you.

"MR. CHURCH: May it please the Court, I would like the record to show our objection to the ruling of the Court on the challenge for cause.

"THE COURT: Yes, sir.

"MR. CHURCH: And our exception on the ruling.

"THE COURT: Yes, sir. All right, proceed, Mr. McDonald.

"(Thereupon, further special questions were asked by Mr. McDonald, of the jury venire, to which there was no objection made, nor exceptions reserved, at the conclusion of which the following proceedings were had and done:)

"THE COURT: That's all?

"MR. McDONALD: Yes, sir." (R. pp. 31–42)

ALMON, Judge (dissenting).

If I understand the court's holding, it commutes all pending death sentences to life imprisonment. Further, it has the effect of commuting all future death sentences to life imprisonment until the legislature designates a new place of execution. Under the court's ex post facto theory the death penalty could only be inflicted on persons committing capital crimes after the legislature designates a new place of execution. The court concludes all this because Kilby Prison no longer exists and bases its decision on the "cruel and unusual punishment" and "ex post facto" provisions of the state and federal constitutions.

It is my view that had the legislature intended to abolish capital punishment it would have done so in no uncertain language. It is plain to me that the obvious intent of the legislature was merely to move the state's maximum security penitentiary from Montgomery County to Escambia County. There are naturally many cases of legislative oversight and when these occur it is a proper function of the judiciary to interpret the law so as to give meaning and effect to the manifest intent of the legislature as long as this process does not rise to unconstitutional proportions.

The punishment of death by electrocution has been held by our Supreme Court to be neither cruel nor unusual within the meaning of the constitution. Lee v. State, 227 Ala. 2, 150 So. 164. See also 30 A.L.R. 1452.

The majority holds that to let Brown's death sentence stand would constitute cruel and unusual punishment; to-wit, "psychological cruelty" because of the uncertainty of the date of execution. This position is untenable because Brown's time of execution is already uncertain by operation of the automatic appeal statute and the appellate process.

Tit. 15, § 382(2), provides in part as follows:

"In all cases wherein a defendant is tried and convicted for the commission of a felony against the peace and dignity of the state of Alabama and the death sentence is imposed, it shall be the duty of the trial judge immediately after the imposition of sentence to enter of record, *with or without the direction or election of the defendant,* that the defendant appeals from said judgment of conviction. * * * " (Emphasis added.)

Logically then, the automatic appeal statute imposes the same uncertain delay on Brown as does his present predicament.

In my judgment, no one could successfully contend that the automatic appeal statute is unconstitutional since its major purpose is to insure appellate review when so drastic a punishment is involved. I do not think the existence of the automatic appeal statute needs defending because its provisions inure to the benefit of the defendant.

It is my view then that this possible delay in Brown's execution does not constitute "cruel and unusual punishment."

Were the present situation to continue for several years, I could begin to understand the rationale of the majority on this point. However, as things now stand, I can only regard the situation as a temporary boon to those under sentence of death. I would at least give the legislature time to meet in regular session, i. e., a reasonable time to pass an act designating a new place for executions of the death sen-

tence, before designating the situation psychologically cruel.

In the alternative, the majority opinion advances the proposition that any law the state legislature might in the future enact authorizing the carrying out of the sentence of death by electrocution at Holman Prison would be ex post facto to any living convict then under sentence of death.

I find this argument equally unsustainable.

An ex post facto law is:

" * * * 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender."* Calder v. Bull, 3 U.S. (Dallas) 386, 1 L.Ed. 648.

See also Watson v. Mercer, 33 U.S. (8 Peters) 88, 8 L.Ed. 876; Ogden v. Saunders, 25 U.S. (12 Wheat.) 213, 6 L.Ed. 606; State ex rel. Brassell v. Teasley, 194 Ala. 574, 69 So. 723.

The death penalty in Alabama is legally authorized as a means of punishment under Tit. 15, § 325, Code of Alabama, 1940. Also, under Tit. 14, § 318, it is specifically provided as one of two possible punishments for first degree murder; the other being life imprisonment at the jury's discretion.

Death by electrocution is legally provided for as the *manner* of carrying out the death penalty in Alabama under Tit. 15, §§ 325 and 343, Code of Alabama, 1940.

These specific statutes, then, create and make legal (1) death, (2) by electrocution

in the State of Alabama as punishment for certain crimes.

True, the State Legislature has, by moving the State penitentiary and authorizing the destruction of Kilby Prison, in effect destroyed the *place* where the death penalty is to be executed under Tit. 15, § 348, Code of Alabama, 1940. I find no action on our legislature's part which raises any legal or common sense presumption that the legislature intended to abolish capital punishment in this State. Nor do I believe that the place of execution is so vital to this discussion that it vitiates the law itself.

Rooney v. North Dakota, 196 U.S. 319, 25 S.Ct. 264, 49 L.Ed. 494, cited in the majority opinion, holds squarely that so long as it is within the boundaries of the state having jurisdiction over the offense, the *place* where an execution is to be carried out is of no consequence to the one under sentence, and he is not entitled to be heard on the issue. See also 21 Am.Jur.2d, Criminal Law, § 596.

In this case, North Dakota had a statute fixing the punishment for first degree murder at death by hanging in the jail of the county in which the crime was committed within a period of from three to six months from judgment. Rooney was tried and convicted under this law. Prior to sentencing, however, a new state statute was enacted which provided that the death penalty of hanging should take place in the state penitentiary within six to nine months from judgment.

*Rooney* dealt solely with whether the new law was ex post facto and I believe the language used by Justice Harlan in that case would be equally appropriate to any new law the Alabama Legislature might pass providing that the execution of death sentences by electrocution be moved to Holman Prison.

I quote in pertinent part from *Rooney*:

"It appears from the statement of the case that the statute in force when the sentence of death was pronounced dif-

fered from those in force when the crime was committed and when the verdict was rendered, in these particulars:

"1. By the later law, close confinement in the penitentiary for not less than six months and not more than nine months, after judgment and before execution, was substituted for confinement in the county jail for not less than three months nor more than six months after judgment and before execution.

"2. By the later law, hanging, within an inclosure at the penitentiary by the warden or his deputy, was substituted for hanging by the sheriff within the yard of the jail of the county in which the conviction occurred.

"We are of opinion that in the particulars just mentioned the statute of 1903 is not repugnant to the constitutional provision declaring that no state shall pass an *ex post facto* law. It did not create a new offense, nor aggravate or increase the enormity of the crime for the commission of which the accused was convicted, nor require the infliction upon the accused of any greater or more severe punishment than was prescribed by law at the time of the commission of the offense. The changes, looked at in the light of reason and common sense and applied to the present case, are to be taken as favorable, rather than as unfavorable, to him. It may be sometimes difficult to say whether particular changes in the law are or are not in mitigation of the punishment for crimes previously committed. But it must be taken that there is such mitigation when by the later law, there is an enlargement of the period of confinement prior to the actual execution of the criminal by hanging. The giving, by the later statute, of three months' additional time to live, after the rendition of judgment, was clearly to his advantage, for the court must assume that every rational person desires to live as long as he may. If the shortening of the time of confinement, whether in the county jail or in the penitentiary before execution, would have increased, as undoubtedly it would have increased, the punishment to the disadvantage of a criminal sentenced to be hung, the enlargement of such time must be deemed a change for his benefit. So that a statute which mitigates the rigor of the law in force at the time a crime was committed cannot be regarded as *ex post facto* with reference to that crime. Calder v. Bull, 3 U.S. (3 Dall.) 386, 391, 1 L.Ed. 648, 650, Chase, J.; Story Const. § 1345; Cooley's, Cost.Lim. 267; Com. v. Gardner, 11 Gray, 438, 443; 1 Bishop's Crim. Law, § 280. Besides, the extension of the time to live, given by the later law, increased the opportunity of the accused to obtain a pardon or commutation from the governor of the state before his execution.

\*　\*　\*　\*　\*　\*

"The objection that the later law required the execution of the sentence of death to take place within the limits of the penitentiary rather than in the county jail, as provided in the previous statute, is without merit. However material the place of confinement may be in case of some crimes not involving life, the place of execution, when the punishment is death, within the limits of the state, is of no practical consequence to the criminal. On such a matter he is not entitled to be heard."

In McAdams v. State, 216 Ala. 659, 114 So. 39, we find the following:

"The mode of execution having been changed from hanging to electrocution since the defendant was convicted and sentenced, it is ordered that the circuit court forthwith bring the defendant before it for resentence according to the provisions of the existing law."

In 16A C.J.S. Constitutional Law § 442, it is stated:

"Accordingly, acts requiring execution of a capital sentence to be made at a dif-

ferent place, or out of the public view, or at a different time of the day, or changing the manner of execution from hanging to electrocution, have been held not ex post facto as to prior offenses, as has a constitutional amendment substituting lethal gas for hanging."

Presumably, this same problem was before our Supreme Court in the cases of Seibold v. State, 287 Ala. 549, 253 So.2d 302, Dec. 17, 1970; Edwards v. State, 287 Ala. 588, 253 So.2d 513, Oct. 7, 1971, and Jackson v. State, 239 So.2d 303, Aug. 6, 1970. In *Seibold* execution was set by the court on February 19, 1971. In *Edwards* execution was set by the court on September 18, 1970. In *Jackson* execution was set by the court on October 9, 1970.

Each of these cases was affirmed and execution dates were set subsequent to January 21, 1970.

In none of these cases did the Supreme Court address itself to this issue, yet clearly each of these cases will fall within the ambit of this court's decision.

Lastly, I know of no authority for appellate courts in this jurisdiction to modify or reduce sentences. In Scott v. State, 247 Ala. 62, 22 So.2d 529, Justice Livingston said:

"This court is without authority in criminal cases to reduce the punishment fixed by the jury in the exercise of the discretion given them by law."

Also in Wilson v. State, 268 Ala. 86, 105 So.2d 66, our Supreme Court observed:

,  " . . . The trial court did not have, nor does this court have, authority to modify the punishment. Scott v. State, 247 Ala. 62, 22 So.2d 529. Under the Constitution of Alabama the power to commute a death sentence is vested exclusively in the Governor. Constitution of 1901, § 124; Amendment 38 to the Con-

stitution of 1901, Code 1940, Vol. 1, page 332; Montgomery v. State, 231 Ala. 1, 163 So. 365, 101 A.L.R. 1394; In re Upshaw, 247 Ala. 221, 23 So.2d 861."

For the foregoing reasons I therefore respectfully dissent.

## On Rehearing

CATES, Judge.

In his application for rehearing the Attorney General asserts three propositions of law, viz.

■ "A reasonable time for legislative action should be allowed in situations requiring extensive study and deliberation and a court will not intervene in these matters until it is shown that further legislative delay is intollerable (sic).

White v. Crook, D.C., 251 F.Supp. 401.

■ "The implied repeal of a merely directory statute cannot be a basis for also holding criminal statutes prescribing a type of punishment repealed by implication.

Keith v. State, 157 Ind. 376, 61 N.E. 716.

■ "There is no basis, under Alabama law, for an appellate court reducing or modifying a sentence imposed by a jury.

Scott v. State, 247 Ala. 62, 22 So.2d 529."

First, White v. Crook, supra, as here cited related to a statute excluding women from juries. The creeping decree therein was a product of the prospective overruling doctrine.

■ Postponing finality of execution until the Legislature might again provide for electrocution at another prison is the type of indeterminateness which the New York Court of Appeals disapproved in Hartung v. People, 22 N.Y. 95, 105–107.[1]

---

1. After discussing how a new law left a convict's life at the governor's mercy the opinion continues: " * * * The mode of execution, according to the Revised Statutes, was by hanging (§ 25); but that section is repealed. How, then, is the convict to be executed? This law does not prescribe the manner. The com-

■ Second, we do not characterize § 348, T. 15, as a mere directory statute. Rather it is the means of conferring upon the executioner his immunity from a charge of murder, no small trifle.

§ 348 is specific; § 325 is general.

■ Third, as to *Scott*, supra, it relates only to the "reduction" of sentence. In our view, life imprisonment was the only consequence of a verdict of guilt of murder in the first degree from and after the time of the removal of the electric chair from Kilby Prison and after walls of that prison had been dismantled.

We again call attention to Aaron v. State, 40 Ala. 307.

■ Finally, we consider that any act of the Legislature amending § 348, T. 15, to re-establish the electric chair would in effect be a bill of attainder on Brown.
"\* \* \* Bills of attainder were acts of Parliament whereby sentence of death was pronounced against the accused." Drehman v. Stifle, 75 U.S. (8 Wall.) 595 at 601, 19 L.Ed. 508.

See also Cummings v. Missouri, 71 U.S. (4 Wall.) 277 at 323, 18 L.Ed.2d 356; Cooley's Constitutional Limitations (8th ed.) p. 536 et seq. Often a bill of attainder was ex post facto. See Gaines v. Buford, 1 Dana 481 at 510.

To abate this appeal so as to make our final judgment depend on action vel non by the Legislature after a lapse of well over a year of any lawful place of electrocution would place on that body the burden of be-

mon law cannot be resorted to, for that system, as applied to this subject, was not in existence when this offence was committed, having been superseded by the Revised Statutes. The mode must, therefore, rest in the discretion of the Governor or the sheriff, and, for aught ·I see, the method prevailing in France, or Russia, or Constantinople or that which the English law formerly applied to convictions for heresy or petit treason, may be adopted.

ing the final arbiter of Brown's punishment. Not only would this be contrary to the doctrine of separation of powers but also any act—as to Brown—would be a bill of attainder.

Delay in execution caused by the review under the Automatic Appeal Act is determinate. It ends after our judicial labor. This Court must decide; the Legislature need not.

The application for rehearing is therefore

Overruled.

ALMON, J., dissents.

"\* \* \* When the legislature of 1860 repealed that section of the statute without substituting anything as to the execution of a capital sentence in its place, they necessarily determined that it should no longer be obligatory for the court by its judgment, or the executive officers in the performance of their duties, to resort to that method of inflicting the punishment of death \* \* \*"